742 F.2d 751
 Fed. Sec. L. Rep. P 91,642
GREENFIELD, Bruce H., individually and as a representative
of a class of persons similarly situated
v.
HEUBLEIN, INC., R.J. Reynolds Industries, Inc., and R.J.
Reynolds Tobacco Company.
Appeal of Bruce H. Greenfield, et al.
 No. 83-1846.
 United States Court of Appeals,
Third Circuit.
 Argued June 18, 1984.
Decided Aug. 29, 1984.
As Amended Oct. 10, 1984.
 
 Edwin P. Rome (argued), William E. Taylor, III, Alexander D. Bono, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for appellant.
 John G. Harkins, Jr. (argued), Patricia L. Freeland, Joyce K. Hackenbrach, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellee R.J. Reynolds Industries, Inc.; Michael O. Johnson, Winston-Salem, N.C., of counsel.
 Thomas McGanney (argued), Margaret Murphy, Elizabeth M. Hazlitt, White & Case, New York City, John W. Frazier, IV, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for appellee Heublein, Inc.; David M. Stigler, Farmington, Conn., of counsel.
 Before ALDISERT, Chief Judge, and HIGGINBOTHAM and ROSENN, Circuit judges.
 OPINION OF THE COURT
 ALDISERT, Chief Judge.
 
 
 1
 This appeal presents two principal questions for our consideration: (1) when does a corporation, the target of both friendly and hostile takeover activity, have a duty to disclose publicly the substance of its discussions with the suitor corporations; and (2) if the target makes a public statement, when is that statement materially misleading and under what circumstances must such a statement, if correct when issued, be updated? Here, Bruce H. Greenfield, both individually and as representative of a class of similarly situated investors, sued Heublein, Inc. (hereinafter referred to as "Heublein"), R.J. Reynolds Industries, Inc., and R.J. Reynolds Tobacco Company (hereinafter referred to jointly as "Reynolds"), claiming that they violated the federal securities laws by failing to disclose properly information related to certain merger and anti-takeover negotiations. The district court granted defendants' motion for summary judgment, 575 F.Supp. 1325, and we affirm.
 
 I.
 
 2
 Beginning in mid-1981, Heublein, Inc. came to be regarded as an attractive target for a corporate takeover. One suitor, the General Cinema Corporation, pursued an aggressive approach to acquisition. It began making large, open market purchases of Heublein stock and by February 1982 owned 2.1 million shares, or about 10% of the then outstanding shares. By the end of May 1982, General Cinema's stake in Heublein had increased to 18.9%. At this point, General Cinema suspended open market purchases of Heublein stock. Although General Cinema, in its Schedule 13D filing with the Securities and Exchange Commission, described these purchases as "for investment only," Heublein regarded this activity as part of a hostile takeover attempt and responded accordingly. Early in 1982, Heublein established a high level executive strategy group to look into ways of defusing the General Cinema moves. The members of the group included Heublein President and Chief Executive Officer, Hicks Waldron, Chairman, Stuart Watson, and General Counsel, George Caspar.
 
 
 3
 By early 1982, Reynolds also became interested in acquiring Heublein. After observing the increased open market purchases by General Cinema, Reynolds began to investigate Heublein's corporate position more seriously and decided that, while Heublein was an attractive target, Reynolds could not afford to get into a bidding war and did not want to take any action that Heublein might consider hostile. Reynolds, thus, assumed the position of the white knight, waiting in the wings, ready to rescue fair Heublein from the clutches of General Cinema.
 
 
 4
 July 1982 became the decisive month. For several months Heublein had been trying to reach an agreement with General Cinema to avert an open market buy-out. Although some progress had been made, on July 8 General Cinema altered its bargaining position and issued Heublein a series of "non-negotiable" demands. Waldron and Watson of Heublein considered the demands unacceptable and responded by setting up a confidential meeting with J. Paul Sticht, Chairman of Reynolds, for July 9. At this meeting, Waldron and Watson described their problems with General Cinema, stated their desire to have Heublein remain an independent company, and inquired whether they might expect any hostile action by Reynolds. Sticht confirmed that Reynolds would make no adverse moves against Heublein and went on to describe in some detail both Reynolds' management philosophy and corporate structure. The parties also discussed how the two companies could be combined and how Heublein's upper management personnel could be integrated into Reynolds' organization. This meeting can be fairly described as a preliminary merger discussion and no formal understanding or agreement was reached.
 
 
 5
 On July 14 General Cinema told Heublein that it was considering selling one of its assets, a Florida television station, valued at approximately $150,000,000. Heublein, recognizing that a large influx of capital would give General Cinema the opportunity to resume large scale open market purchases of its stock, did not view this as good news. Also on July 14, there was a dramatic increase in trading activity in Heublein's stock on the New York Stock Exchange (NYSE) as well as a moderate rise in price.[1] Because of the volume/price increase, Patrick Conneally of the NYSE contacted Caspar at Heublein and asked for a "no corporate development" statement. It is standard procedure for the NYSE to request such statements when the activity of a listed stock changes significantly indicating that some investors may be buying or selling large numbers of shares based on information not generally known to the public at large. After consulting with several other Heublein executives, Caspar issued the following statement, which was reported by Dow Jones after the close of trading on July 14th:
 
 
 6
 A spokesman for Heublein, Inc. said the Company was aware of no reason that would explain the activity in its stock in trading on the NYSE today.
 
 
 7
 Because of their increased concern over the actions of General Cinema, Waldron and Watson quickly organized another meeting with Sticht for the evening of July 15. Although this meeting covered much of the same territory as the July 9 meeting, the parties also discussed the July 14 public statement and the recent developments in the General Cinema situation.
 
 
 8
 Heublein still believed that it could still negotiate an amicable agreement with General Cinema. On July 23, however, General Cinema, impatient with the progress of the Heublein talks, reiterated its "non-negotiable" demands for what would constitute an acceptable agreement and openly threatened to resume its open market purchases. Heublein considered this turn of events fatal to the discussions and, sensing the seriousness of the threat, called upon its white knight for rescue. While many merger details had been discussed with Reynolds, price had never been mentioned. Therefore, at the direction of the respective corporate executives, the investment bankers for Reynolds and Heublein met on July 26 to discuss the per share purchase price. No agreement was reached. On the 27th, disappointed at the failure of the previous day's bankers meeting, Waldron and Watson met directly with Sticht and Joseph Albey, Reynolds' Vice Chairman. Late in the afternoon they agreed on a sale price of $60.00 per share.
 
 
 9
 On July 28 the NYSE again called Caspar to request that Heublein issue a "no corporate development" statement. Caspar responded that Heublein could not issue the statement, explained why, and requested that trading on Heublein stock be suspended. With the issuance of a public statement by Heublein at 1:24 p.m., trading on its stock was halted.[2] On July 29 the merger was approved by the boards of both Heublein and Reynolds and was publicly announced.
 
 
 10
 Bruce Greenfield owned some 400 shares of Heublein stock since 1977. He was generally aware of the hostile takeover action by General Cinema and watched closely the increased activity, and rises in price, of Heublein stock during July 1982. He was aware of the "no corporate development" statement issued on July 14 and, on the basis of this information and his own knowledge, believed that Heublein's stock would be fully priced at $45.25. On July 26 he placed a "good till cancelled" order to sell his Heublein stock should it reach this price. On July 27 it reached $45.25 and Greenfield's stock was sold. On the next day, trading was suspended and on the 29th the merger was approved and announced.
 
 
 11
 Greenfield filed suit claiming that in issuing and in failing to update the July 14 statement Heublein had illegally withheld material information concerning its takeover discussions with both General Cinema and Reynolds.[3] The complaint alleged violations of Secs. 10(b) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. Secs. 78j(b) and 78n(e), Rule 10b-5, 17 C.F.R. Sec. 240.10b-5 (1983),[4] as well as several provisions of state law. Following discovery, the district court denied plaintiff's motion to amend his complaint, and, taking into account all of the arguments raised therein, granted defendants summary judgment on all federal counts and dismissed the pendent state law claims.[5] Greenfield appealed.
 
 II.
 
 12
 We will affirm the grant of summary judgment if there are no disputed issues of material fact and if the movant is entitled to judgment as a matter of law. Coastal States Gas Corp. v. Department of Energy, 644 F.2d 969, 978-79 (3d Cir.1981). Greenfield argues that summary judgment was error here because the district court used the wrong legal standard to determine whether an agreement in principle to merge had been reached and, if the correct principle were applied, a factual dispute as to the intent of the parties would be present. Greenfield also argues that, as a matter of law, the July 14 statement was either materially misleading when issued or became so thereafter and Heublein failed to correct it. Therefore, the resolution of this appeal turns on the scope and character of a corporation's duty to disclose information to the investing public. Our analysis will follow two steps: (1) when does a duty to disclose arise in the context of merger/anti-takeover discussions, see Staffin v. Greenberg, 672 F.2d 1196 (3d Cir.1982); and (2) when a voluntary public statement is made, under what circumstances will it be materially misleading when issued or become so on the basis of subsequent events, see Securities and Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir.1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).
 
 III.
 
 13
 Rule 10b-5 and Sec. 10(b) of the Act make it unlawful to fail to disclose material information in connection with the purchase or sale of securities. Chiarella v. United States, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); Securities and Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir.1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Similarly, Sec. 14(e) of the Act requires that statements made in connection with proxy solicitations and tender offers set forth all material facts. Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). Such disclosures are required to insure that all investors have similar relevant information upon which to base investment decisions and to protect the basic integrity and fairness of the exchange markets. Rochelle v. Marine Midland Grace Trust Co., 535 F.2d 523 (9th Cir.1976). If a corporation is not trading in its securities and is not otherwise under a duty to disclose material corporate information, but it voluntarily chooses to make a public statement, if that statement is "reasonably calculated to influence the investing public ..." the corporation has a duty to disclose sufficient information so that the statement made is not "false or misleading or ... so incomplete as to mislead ...." Texas Gulf Sulphur, 401 F.2d at 862.
 
 
 14
 With specific reference to merger discussions, we have held that, so long as they are preliminary, no duty to disclose arises. Staffin, 672 F.2d at 1205-07. We reasoned that because disclosure of such tentative discussions may itself be misleading to shareholders, preliminary merger discussions are immaterial as a matter of law. Id. at 1206; see also Susquehanna Corp. v. Pan American Sulphur Corp., 423 F.2d 1075, 1084-85 (5th Cir.1970). We recognized, however, that as merger discussions progress, the need to protect shareholders from the potentially misleading disclosure gives way to the right of the shareholders to have notice of corporate developments important to their investment decisions. Thus, we further held that "[w]here an agreement in principle [to merge] has been reached a duty to disclose does exist." Staffin, 672 F.2d at 1207.
 
 A.
 
 15
 With respect to the Reynolds negotiations, the court below held, as a matter of law, that no agreement in principle to merge was reached, and thus no duty to disclose arose, until sometime after Greenfield sold his stock on July 27. The court stated:
 
 
 16
 While an "agreement in principle" may exist before all of the details of a merger have been negotiated ... it is clear that agreement on the fundamental terms of the merger must be reached before the merger negotiations become a material corporate development that must be disclosed to the investing public. Without fundamental agreement on the price and structure of a merger, the merger is simply too tentative to give rise to a duty of disclosure.
 
 
 17
 Memorandum opinion at 25, reprinted in app. at 1489a (emphasis added). As we read the district court's opinion, it stated that an agreement in principle requires agreement on the fundamental terms of the merger. The court then applied this formulation and determined that, in the case before it, an agreement in principle had not been reached until July 27 because the parties had not yet agreed on the price and structure, terms fundamental to this proposed merger. We find no error under the circumstances of this case.
 
 
 18
 Merger discussions arise in a wide variety of circumstances and the standard used to determine when disclosure of these is required must be both flexible and specific. Here the appellant takes issue with the district court's reliance on the price and structure factors and urges that we adopt a less rigid "intent of the parties to merge" standard. We find an intent standard inappropriate. Such a standard would leave both courts and corporations with insufficient guidance to determine when disclosure of merger negotiations should be made. This uncertainty, coupled with the possibility of substantial liability for tardy disclosure, would likely result in corporations issuing early public statements announcing the details of all merger talks. Not only would this have a disruptive effect on the stock markets, but, considering the delicate nature of most merger discussions, might seriously inhibit such acquisitive ventures.
 
 
 19
 Under the facts of the present case, it was more appropriate for the court below to determine that an agreement in principle to merge had been reached when the parties reached agreement on "price and structure." Although it is difficult to draw a bright line definition that will apply to all cases, these two factors are typically critical aspects of any merger. Agreement as to price and structure provides concrete evidence of a mature understanding between the negotiating corporations. They constitute a useable and definite measure for determining when disclosures need be made. Finally, with both price and structure agreed to, there is only a minimal chance that a public announcement would quash the deal or that the investing public would be misled as to likely corporate activity.
 
 
 20
 Here, most of the structural details for integrating both the Heublein product line and management team into the Reynolds corporate body had been worked out by the middle of July. But price was not discussed in detail, nor agreed to, until later. Therefore, we conclude that, because Reynolds and Heublein did not agree on a merger price until the evening of July 27, it was not error for the district court to hold that, as a matter of law, no duty to disclose the substance of those negotiations arose prior to that time.
 
 B.
 
 21
 The discussions between Heublein and General Cinema cast a slightly different shadow. The goal of those discussions was not to arrive at an agreement to merge but rather to halt a hostile, open market takeover. Further, the result of the talks was not an agreement but, at best, a stalemate. In terms of the duty to disclose, however, the differences between Heublein's discussions with General Cinema and those with Reynolds are more of form than legal substance.
 
 
 22
 As with the Heublein-Reynolds preliminary merger negotiations, the Heublein-General Cinema discussions were still being seriously pursued through most of July, at least by Heublein. As its talks with Reynolds made clear, Heublein still thought that it could deflate General Cinema's hostile takeover actions and come to some agreement that would assure the continued independence of Heublein. This was true despite the fact that General Cinema had, on July 8, issued "non-negotiable" demands and, on July 14, expressed its intent to sell the Florida television station. While these elements troubled Heublein and caused it to accelerate its parallel negotiations with Reynolds, it was not until July 23, when General Cinema reiterated its prior statements and threatened to resume open market purchases of Heublein stock, that Heublein realized that further talks would be futile.
 
 
 23
 Therefore, until July 23, the Heublein-General Cinema "anti-takeover" discussions were alive, if falteringly so. They were, however, clearly "preliminary" as no consensus "on the fundamental terms" of any agreement between the parties had been reached. Any disclosure up to this point would have been based on facts that were subject to change at any time. As the situation evolved, successive, possibly cancelling, announcements might have been required. This would have tended to confuse and mislead, rather than enlighten, the investing public. See Staffin, 672 F.2d at 1206-07 (citing the American Stock Exchange Manual at 104). Therefore, by analogy to the preliminary merger situation, we hold that Heublein was under no duty to disclose the substance of its General Cinema talks prior to July 23.
 
 
 24
 On July 23, with General Cinema taking an increasingly hostile stand, Heublein abandoned all hope of reaching an agreement. Appellant urges that we characterize this abandonment as the negative equivalent of an agreement in principle to merge and, thereby, hold that, as of July 23, Heublein was under a duty to disclose the status of its talks with General Cinema. Appellant does not cite, nor does our research disclose, any case in support of this novel theory. On the facts of this case, there are several reasons why we choose not to be the first court to create such a duty. Failure to agree is not the negative equivalent of an agreement in principle. If parties reach an agreement in principle, they formally change their relative positions; if they fail to reach such an agreement, they are simply left in the same positions they would have been had no negotiations taken place. Thus, while an agreement in principle to merge, as a matter of law, constitutes a material corporate development requiring public disclosure, the failure to agree may well constitute no development at all, only, at best, a foregone opportunity. Such was the case here. Both before the negotiations began and after they were abandoned, General Cinema owned a substantial amount (nearly 20% by June 1982) of Heublein's outstanding stock and was, at least implicitly, in a position to increase that stake through continued open market purchases. Both before and after, Heublein considered these purchases to represent hostile action and was pursuing strategies designed to block General Cinema's takeover activity. Therefore, under the facts of this case, the breakdown of the Heublein-General Cinema talks on July 23 did not materially change the relative positions of either corporation and, as a matter of law, was not a material corporate development giving rise to a duty to disclose.
 
 IV.
 
 25
 Although a corporation may be under no duty to disclose certain inside information, if it voluntarily chooses to make a public statement that is reasonably calculated to influence the investing public, such a statement may not be "false or misleading or ... so incomplete as to mislead ...." Securities and Exchange Commission v. Texas Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir.1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Further, if a corporation voluntarily makes a public statement that is correct when issued, it has a duty to update that statement if it becomes materially misleading in light of subsequent events. Sharp v. Coopers & Lybrand, 83 F.R.D. 343, 346-47 (E.D.Pa.1979). Appellant argues: (1) that Heublein's July 14 statement, issued to the NYSE, was materially misleading when issued; and (2) that even presuming it was not materially misleading when issued, it became so in light of subsequent events and was never corrected.
 
 A.
 
 26
 As noted earlier, based on unusually high trading activity in Heublein's stock on July 14, the NYSE requested, and Heublein's General Counsel, after checking with several other executives, issued, the following "no corporate development" statement:
 
 
 27
 A spokesman for Heublein, Inc. said the Company was aware of no reason that would explain the activity in its stock in trading on the NYSE today.
 
 
 28
 The court below concluded that this statement was not materially misleading. Appellant urges us to reverse this determination. Whether a statement is materially misleading is a mixed question of law and fact to which we would normally apply a mixed standard of review. Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977); Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102 (3d Cir.1981). But here, because appellant argues that the district court erred in its application of legal precepts in determining that the subject statement was not misleading, our review is plenary.
 
 
 29
 The request for a "no corporate development" statement was an inquiry to try to explain the upsurge in public activity in Heublein's stock. As we have previously established, on July 14, Heublein was under no duty to disclose, and had not disclosed, the substantive elements of its discussions with either Reynolds or General Cinema. Each discussion was in a preliminary stage and no "agreement in principle," or any functional equivalent thereof, had been reached. Further, because of the confidential nature of these discussions, there was no basis for Caspar to believe, and appellant alerted the district court to no evidence which might tend to prove, that any of the details of these discussions, not previously known to the public, had been recently leaked.[6] Also, although Heublein had recently been the subject of public speculation regarding possible mergers and takeovers, see Wall St. J., Jan. 28, 1982, at 12, reprinted in app. at 83a, there is nothing to suggest that it started or encouraged any such rumors. Finally, with respect to General Cinema, its open market purchases were a matter of public record, see id., May 27, 1982, at 2, reprinted in app. at 82a, as was Heublein's resistance thereto, see Heublein Press Release of Feb. 22, 1982, reprinted in app. at 85a; Wall St. J., June 1, 1982, at 10, reprinted in app. at 199a. Therefore, when the NYSE called Caspar on July 14, he was understandably unable to explain what had caused the dramatic increase in activity in Heublein's stock that day. While he, and other Heublein executives, clearly knew of information that might have accounted for the increase in trading, there was no indication that any of this privileged information had been leaked or that they knew of, or had, information that insiders were engaged in trading. Accordingly, there is no support to the keystone of the dissent's hypothesis of the probability that this information could have been leaked, dissent at 765. Under these circumstances, we conclude that, as a matter of law, Caspar's statement that Heublein "was aware of no reason that would explain the activity in its stock ..." was not false, inaccurate, or misleading.[7]
 
 B.
 
 30
 Appellant next asserts that, even presuming the July 14 statement was correct when given, subsequent events made it materially inaccurate and Heublein breached its duty to correct it. Heublein responds that, by its own terms, the statement spoke only about the activity in its stock on July 14. The statement expired the next day and, therefore, was inapplicable to subsequent trading activity. Thus, Heublein asserts that the company was under no duty to correct the contents of the statement even if it were to become materially misleading on the basis of future events.
 
 
 31
 Although a close reading of the statement lends some support to Heublein's view, we need not concern ourselves with it further because, even presuming that the July 14 statement survived the date of issuance, as a matter of law, it never became materially misleading on the basis of subsequent events and, therefore, no duty to correct ever arose. This conclusion inescapably follows because, as previously shown, Heublein was never under a duty to disclose any of the substantive details of its discussions with either Reynolds or General Cinema prior to July 28.
 
 V.
 
 32
 Appellant raises several final contentions, none of which need detain us long. First, because we conclude that the grant of summary judgment against appellant on his federal securities claims was proper, the district court did not err in dismissing the aiding and abetting claims against Reynolds. Second, because the district court, in ruling on defendant's summary judgment motion, expressly considered the new claims contained in appellant's motion to amend his complaint, the court's refusal to grant the amendment motion was not error in light of its disposition of the case. Last, appellant asserts that, if all else done below was proper, then, as to its state law claims, the district court should have transferred them to the appropriate state court as provided in 42 Pa.Cons.Stat.Ann. Sec. 5103 (Purdon 1983), rather than simply dismissing them. See Weaver v. Marine Bank, 683 F.2d 744 (3d Cir.1982). Because appellant, both at trial and on appeal, failed to present any equitable considerations that would indicate why the state claims should be transferred, we hold that it was not error for the district court to have dismissed them. Moreover, Pennsylvania has now amended its transfer statute to permit the preservation of claims filed in federal court without the necessity of any transfer order. 42 Pa.Cons.Stat.Ann. Sec. 5103(b) (Purdon Supp.1983); see McLaughlin v. Arco Polymers, Inc., 721 F.2d 426 (3d Cir.1983).
 
 VI.
 
 33
 Accordingly, the judgment of the district court will be affirmed.
 
 
 34
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.
 
 
 35
 I dissent from the majority opinion because I believe that Heublein's July 14 statement was false or misleading. In my view, it is false or misleading for a corporation to voluntarily issue a statement that it is aware of no reason to explain increased trading in its stock when the corporation "clearly knew of information that might have accounted for the increase in trading." (Majority Opinion at 759).
 
 
 36
 I agree with the majority that a corporation is under no legal obligation to make disclosures concerning its merger activities until an agreement in principle is reached. I also agree that on July 14, when the NYSE sought a no corporate development statement from Heublein, no agreement in principle had yet been reached between Heublein and Reynolds. Moreover, I do not believe that a NYSE inquiry concerning corporate activity creates a duty to disclose. Thus, on July 14, Heublein was under no legal obligation to issue any statement in response to the NYSE inquiry concerning the unusually high trading activity in Heublein's stock on that day. Even though, as the majority concedes, Heublein clearly knew of information that could have accounted for the increased trading of its stock, Heublein could have remained silent in the face of the NYSE inquiry or answered "no comment."[1]
 
 
 37
 My disagreement with the majority opinion involves Heublein's breach of its duty not to mislead. This duty applies to any corporate statement reasonably calculated to influence the investing public whether or not a duty to disclose exists.[2] Once Heublein opted, however, to issue a statement that was reasonably calculated to influence the public, the July 14 statement, Heublein was obligated to ensure that its statement was not "false or misleading or ... so incomplete as to mislead." SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir.1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). In addition, Heublein had a duty to update the July 14 statement if it became materially misleading in light of subsequent events. See Sharp v. Coopers & Lybrand, 83 F.R.D. 343, 346-47 (E.D.Pa.1979).
 
 
 38
 In this case the majority and dissent agree that at the time Heublein issued its July 14 statement, it "clearly knew of information that might have accounted for the increase in trading" (Majority Opinion at 759) of its stock. Having established this clear knowledge on the part of Heublein, the question becomes whether Heublein misled the investing public by issuing the following voluntary response to an NYSE inquiry concerning the increased trading in Heublein's stock on July 14.
 
 
 39
 A spokesman for Heublein, Inc. said that the Company "was aware of no reason that would explain the activity in its stock" in trading on the NYSE that day. Majority Opinion at 759. I believe that Heublein's July 14 statement was false or misleading when issued and remained so throughout the merger discussions involving Heublein, Reynolds and General Cinema. In my view, the July 14 statement must be considered false or misleading because, as the majority concedes, at the time the statement was made Heublein clearly knew of information that could have accounted for the increased trading of its stock on that day.
 
 
 40
 It is not clear why the majority refuses to consider Heublein's July 14 statement misleading. Perhaps the majority wishes to prevent the NYSE from dictating by its inquiries when corporate disclosures are made.[3] If, however, the majority's concern is to protect the corporation from being forced to make premature disclosures and thereby to protect a corporation from possibly having to upset sensitive negotiations, this concern, while legitimate, appears misguided. There is nothing in the record of this case to suggest that a corporation, when faced with a "no corporate development" inquiry from the NYSE is faced with the all or nothing proposition of either completely spilling the beans or claiming (even at the expense of total forthrightness) that it has no knowledge whatsoever of any information that might explain the stock activity of concern to the NYSE.
 
 
 41
 The majority states in footnote 6 of its opinion that my dissent imposes a duty to disclose privileged information before an agreement in principle has been reached. Presumably, the majority reads my dissent as allowing an NYSE inquiry, or even the mere knowledge of privileged information possibly relevant to market activity if leaked, to trigger the duty to disclose. However, footnote 6 of the Majority Opinion clearly demonstrates how the majority fails to distinguish between the duty to disclose and the duty not to mislead. The majority does not appreciate that this dissent stands for the simple proposition that in the face of a NYSE inquiry, Heublein could have remained silent or answered "no comment," but, by virtue of voluntarily issuing its July 14 statement, Heublein assumed responsibility for honoring another duty--the duty not to mislead. Thus, if the majority's concern is preventing the NYSE from dictating when corporate disclosures must be made, that concern is not implicated in this case.
 
 
 42
 If the majority is truly concerned about protecting the public from misleading corporate information, it is difficult to understand how the majority could condone Heublein's July 14 statement. In that statement Heublein said: "the Company was aware of no reason that would explain the activity in its stock in trading on the NYSE today." Majority Opinion at 754. In effect, Heublein stated that it had no knowledge of any corporate activity that would affect trading in its stock. How can the majority consider Heublein's July 14 statement not to be false or misleading or so incomplete as to mislead when the majority recognizes that Heublein "clearly knew of information that might have accounted for the increase in trading [in Heublein's stock]" on July 14? Majority Opinion at 759.
 
 
 43
 The majority itself recognizes that a statement issued prior to July 27, the day the agreement in principle was reached, could mislead the investing public. The majority stated,
 
 
 44
 [a]ny disclosure up to this point would have been based on facts that were subject to change at any time. As the situation evolved, successive, possibly cancelling, announcements might have been required. This would have tended to confuse and mislead, rather than enlighten, the investing public.
 
 
 45
 Majority Opinion at 757. Notwithstanding its recognition that a statement issued before July 27 would have tended to mislead, the majority holds the July 14 statement to be not misleading.
 
 
 46
 Not only does the majority allow Heublein's July 14 statement to stand as not misleading on that date, the majority misinterprets the law in avoiding appellant's alternative contention that even assuming the July 14 statement was correct when given, subsequent events made it materially inaccurate and Heublein breached its duty to correct it.
 
 
 47
 The majority states,
 
 
 48
 even presuming that the July 14 statement survived the date of issuance, as a matter of law, it never became materially misleading on the basis of subsequent events and, therefore, no duty to correct ever arose. This conclusion inescapably follows because, as previously shown, Heublein was never under a duty to disclose any of the substantive details of its discussions with either Reynolds or General Cinema prior to July 28.
 
 
 49
 Majority Opinion at 759 (emphasis added).
 
 
 50
 The majority, in my view, cannot avoid this issue. As stated earlier, this case concerns two separate duties: (1) the duty to disclose an agreement in principle, and (2) the duty not to make a statement that is "false or misleading or ... so incomplete as to mislead" the investing public, SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir.1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). This second duty also requires the updating of statements which become misleading because of subsequent events. See Majority Opinion at 758.
 
 
 51
 The first duty is engaged only when an agreement in principle has been reached. The second duty is engaged whenever a corporation issues a statement reasonably calculated to influence the investing public; thus, this duty can be engaged irrespective of whether an agreement in principle has been reached. The majority recognized this second duty when it said,
 
 
 52
 if a corporation voluntarily makes a public statement that is correct when issued, it has a duty to update that statement if it becomes materially misleading in light of subsequent events. Sharp v. Coopers & Lybrand, 83 F.R.D. 343, 346-47 (E.D.Pa.1979).
 
 
 53
 Majority Opinion at 758. Thus, the majority's conclusion that "no duty to correct ever arose ... because ... Heublein was never under a duty to disclose any of the substantive details of its discussions with either Reynolds or General Cinema prior to July 28" (Majority Opinion at 760) is erroneous. Heublein had a duty to update irrespective of whether it had a duty to disclose at the time of the NYSE inquiry. These are two separate duties. The majority is wrong to use the absence of a duty to disclose to avoid the presence of the duty to update where a statement already has been made.
 
 
 54
 I fear that today's decision will have serious repercussions for the investing public caught in the middle of battles for and against mergers, acquisitions and corporate control. The majority states,
 
 
 55
 because of the confidential nature of [Heublein's discussions with Reynolds and General Cinema], there was no basis for Caspar to believe, and appellant alerted the district court to no evidence which might tend to prove that any of the details of these discussions, not previously known to the public, had been recently leaked. Majority Opinion at 759.
 
 
 56
 The majority suggests that Heublein's July 14 statement would be false or misleading only if Heublein knew that information was leaked. Majority Opinion at 759. I believe that Heublein's July 14 statement is misleading because Heublein knew of information that if leaked would have explained the increase in trading of Heublein's stock on that day. Statements such as Heublein's July 14 statement should be permitted only when Heublein itself knows of no information that could have accounted for the increase in trading of its stock. Because then and only then would the impression conveyed to the investing public that business is proceeding as usual be true.
 
 
 57
 Under the majority's approach Heublein could issue the July 14 statement, without updating it, so long as (1) an agreement in principle had not yet been reached and (2) the merger negotiations were confidential. In short, Heublein is free to assume that its confidences are maintained and accorded complete secrecy, even in the face of otherwise inexplicable investor activity. I find that assumption unwarranted.
 
 
 58
 Where there has been no agreement in principle reached by the parties, a corporation is under no obligation to disclose information that it desires to keep secret. This is true even in the face of a NYSE request for a no corporate development statement. Silence or a simple "no comment" is always an available option for a corporation. Such responses would not require any future updates. Updates are required only of corporate disclosures, and neither of these responses can be considered a disclosure. Moreover, these responses would certainly protect the corporation from disclosing sensitive developments while simultaneously protecting the public from being falsely assured that all is proceeding at a routine, business-as-usual pace when that is not the case.
 
 
 59
 Although the majority's approach makes it easier to put together corporate deals and mergers, I do not believe that the holding of the majority protects sellers or purchasers of stock. If anything it subjects the investing public to future voluntary misrepresentations by corporations in the midst of allegedly confidential merger discussions. So long as they remain unaware of leaks, even though there is information to leak, they can falsely assure the public that all is proceeding at a business-as-usual pace. I find it difficult to assume that a corporation's confidences are accorded more secrecy than the contents of high level discussions held in the oval office which are all too frequently leaked to the press.
 
 
 60
 Similarly, in the "Pentagon Papers" cases[4] the New York Times and the Washington Post obtained access to all or most of a 47-volume super secret Defense Department Study on the "History of United States Decision Making Process on Vietnam Policy." They also obtained the Defense Department's Weapons System Evaluation Group's classified document entitled "The Command and Control Study of the Tonkin Gulf Incident." If the U.S. Defense establishment could not keep perfectly secret their volumes of classified documents which allegedly affected the "security of the United States," id. at 718, why should we believe that Heublein can maintain total confidentiality as to merger discussions among its diverse executives, staff, secretarial and clerical personnel; its outside investment banker's staff and its outside counsel's staff. The facts of life as we know them are that complete confidentiality has not always been possible at either the White House or the Defense establishment or in the non-clandestine corporate community.
 
 
 61
 The truth of the matter is that material nonpublic information is leaked to some "favorites" among the investing public and the success of many investors is not because they have the genius of an Einstein but solely because they have tidbits of information that the general public does not have. Insider trading is the most dramatic example of the use of material nonpublic information. Although this case does not involve insider trading, the problem of insider trading demonstrates that material nonpublic information is often leaked and used. For example in 1983, the S.E.C. brought 24 cases as compared to 20 commenced during fiscal 1982 and the total number brought since 1949 (121 cases). 1983 S.E.C.Ann.Rep. 5. These figures for 1982 and 1983 represent 28% of the cases that the S.E.C. has brought in this area since 1949.
 
 
 62
 The problem of investors trading based on nonpublic information is not restricted to contexts involving violations of law. In Dirks v. SEC, 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), the Supreme Court recognized that nonpublic information may even be disclosed by insiders in contexts not involving insider trading or violations of law. Id. at 3262-63. As the Supreme Court noted "only some persons, under some circumstances, will be barred from trading while in possession of material nonpublic information." Id. at 3262. "[This] exception is based upon Congress' recognition that [market professionals] contribute to a fair and orderly marketplace at the same time they exploit the informational advantage that comes from their possession of [nonpublic information]." Id. at 3262, quoting United States v. Chiarella, 445 U.S. 222, 233, n. 16, 100 S.Ct. 1108, 1117 n. 16, 63 L.Ed.2d 348.
 
 
 63
 Thus, it is possible that the increase in trading of Heublein's stock occurred based on nonpublic information. In light of this, we believe that the majority is in error when it allows Heublein to assume that nonpublic information could not have been leaked knowingly or unknowingly by persons associated with Heublein, its lawyers, its investment bankers, Reynolds or the host of personnel affiliated with these groups.
 
 
 64
 Yet the majority bases its decision today on an assumption that Heublein and every individual or organization privy to Heublein's critical information had no leaks. I believe our concern should be whether any information existed to be leaked. The majority expressly conceded that such information exists when it states that Heublein "clearly knew of information that might have accounted for the increase in trading...." Majority Opinion at 759 (emphasis added).
 
 
 65
 This information was of great significance. When Heublein issued its July 14 statement that the Company was aware of no reason that would explain the activity in Heublein's stock in NYSE trading, that day there were in fact significant reasons known to its top executives that could have explained the increased activity of its stock.
 
 
 66
 On July 9--five days before Heublein issued its statement--the top executives from Reynolds (Sticht) and Heublein (Watson and Waldron) had met in the VIP room of the Hartford Airport to accommodate Sticht, who flew in from North Carolina on Reynolds' corporate jet for the meeting. These top executives discussed how the companies would function if merged and discussed the synergies in staff and productivity improvement that would result from the merger. This included Heublein's ability to improve its marketing program because of the resources available at Reynolds. Heublein would thus be able to do a "more aggressive job of building Kentucky Fried Chicken stores and expanding [its] market presence in that business." (Appendix at 1116A-17A, 1120A-21A). They discussed Heublein's desire to maintain its "independence" and how the food aspect of Reynolds would be combined with Heublein's into one overall food operation of which Waldron would be the head. They decided that Waldron and Watson would become directors of Reynolds. (1115A-16A; 1124A-26A). The significance of the meeting was recognized. Sticht had asserted that Reynolds was prepared to go ahead (995A), and he considered this meeting a "fairly important turn of events."
 
 
 67
 The conference of the presidents of these two major institutions could be considered a corporate summit meeting. Indeed after this meeting Waldron called Heublein's investment banker--Krimendahl of Goldman Sachs & Company. He advised Krimendahl that Waldron would become the head of the combined foods division once Heublein and Reynolds merged. Waldron asked Krimendahl to pass all of this information along to attorney McNally of White and Case. After July 8th, Waldron held separate meetings with Watson, Heublein's task force members and their outside advisors, Krimendahl of Goldman Sachs & Company and McNally of White and Case, during which the idea of Reynolds acting as Heublein's "white knight" was discussed. (Appendix at 1071A-72A; 1074A-75A; 1078a-79a; 1080a; 1083a; 1085a; 1089a; 1095a; 1099a-1102a; 1135a; 1137A).
 
 
 68
 During this same period Reynolds had a task force that evaluated Heublein with a view toward acquisition of it within a specific price range. (1053A-54A; 1162A-63A). With several separate groups, executives, investment banking staff, legal staff and probably many other persons working on the details of a possible Heublein merger, it is not surprising that these frantic and secretive activities might be leaked, be ascertained, or be unintentionally brought to the attention of persons buying or selling Heublein stock. Certainly any information that suggests these corporate giants were exploring a possible merger could explain the activity on the stock market.
 
 
 69
 The majority seems determined to rest its entire case on the belief that corporate executives should be able to suggest that all is proceeding at a routine, business-as-usual pace when that is not the truth so long as an agreement in principle has not been reached at the time the statement is issued. Given the majority's concession that in this case Heublein knew of information that might have accounted for the increase in the trading of Heublein's stock and given the possibility that information could have been leaked to or ascertained by some investors, a statement by Heublein that it was aware of no reason to explain the increase in the trading of its stock was false or misleading or so incomplete as to mislead.
 
 
 70
 I dissent.
 
 
 
 [1]
 On July 13, 1982, in typical trading, approximately 32,500 shares of Heublein stock were traded, and the closing price was $40.25 per share. On July 14, approximately 242,500 shares were traded and the price rose to $43.00 at closing
 
 
 [2]
 The statement read:
 At Heublein's request, the New York Stock Exchange has suspended trading in the company's stock. There is a matter in the mid-stream of development and the company expects to have a statement tomorrow.
 
 
 [3]
 Specifically, the complaint alleged that Heublein violated the securities laws and that Reynolds aided and abetted in those violations
 
 
 [4]
 Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
 * * *
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 Section 14(e) of the Act, 15 U.S.C. Sec. 78n(e) provides:
 It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.
 Rule 10b-5, 17 C.F.R. Sec. 240.10b-5 (1983), provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 [5]
 The district court did not certify a class. By agreement of the parties this issue was reserved until after the resolution of the summary judgment motion. See Memorandum opinion at 4 n. 5, reprinted in app. at 1468a n. 5
 
 
 [6]
 The dissent suggests that even privileged information must be disclosed because of the probability that information could have been leaked to the investing public or ascertained by the investing public, dissent at 765, that the two companies were exploring a merger. Imposing such a duty prior to July 28 runs counter to the precept that there is no duty to disclose negotiations until an agreement in principle has been reached. We know of no duty to disclose ongoing negotiations because of the possibility of a leak
 
 
 [7]
 Although Caspar could have made any number of other statements saying substantively the same thing, this is of no consequence to our decision today. We must judge the statement made. Although Caspar might properly have responded "no comment" to the NYSE inquiry, this likewise is of no import. He did not so respond and for us to now hold that he should have would inexorably imply that the statement he actually made was legally infirm. This, as we have demonstrated, is not the case
 
 
 [1]
 An agreement in principle had not been reached as of July 14; thus, on that date, Heublein was under no legal obligation to disclose its preliminary merger discussions. Where one is not under a legal obligation to disclose, I do not consider a response of "no comment" to be a statement carrying any legal significance. In my view it is the legal equivalent to not making a statement at all
 
 
 [2]
 This case concerns both the duty to disclose where an agreement in principle has been reached and the duty not to issue corporate statements which are false or misleading. I have absolutely no dispute with the majority's conclusion that Heublein was under no duty to disclose at the time it issued its July 14 statement. Thus, this dissent concerns only the duty relating to a voluntary corporate statement "reasonably calculated to influence the investing public."
 
 
 [3]
 As noted earlier, however, a NYSE request for a no corporate development statement does not oblige the corporation to disclose anything
 
 
 [4]
 New York Times v. United States, 328 F.Supp. 324 (S.D.N.Y.), rev'd, 444 F.2d 544 (2d Cir.); rev'd, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971). See also United States v. Washington Post, 446 F.2d 1327 (D.C.Cir.) aff'd 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)