Robert A. PAUL, as custodian and trustee for Laurence E. Paul, Stephen E. Paul and Karen R. Paul; Marshall L. Berkman, as custodian and trustee for Laura G. Berkman, Ellen F. Berkman and Martha L. Berkman; Donna B. Paul: the Louis Berkman Company; the Louis and Sandra Berkman Foundation; and the M & I Marshall and Ilsley Bank, as trustee for the Louis Berkman Company Pension Trust, Plaintiffs,

v.

Jack N. BERKMAN, Myles P. Berkman and Associated Communications Corporation, Defendants.

Civ. A. No. 85–0326.

United States District Court, W.D. Pennsylvania.

Oct. 29, 1985.

Martin Flumenbaum, New York City, Pamela A. McCallum, Pittsburgh, Pa., for plaintiffs.

E.J. Strassburger, Pittsburgh, Pa., Bruce W. Kauffman, Philadelphia, Pa., William H. Mulligan, New York City, for defendants.

## OPINION

ZIEGLER, District Judge.

This court is called upon to resolve an intrafamily dispute arising from the sale of 1,018,540 shares of Associated Communications Corporation (ACC) stock. Plaintiffs, members of the Louis Berkman family, argue that defendants, members of the Jack Berkman family, induced the sale by making fraudulent representations and omissions in violation of state law and Section 10(b) of the Securities Exchange Act of 1934 and regulations thereunder. 15 U.S.C. § 78j. Defendants have moved for summary judgment. We find that there are genuine issues of material fact for resolution by a fact-finder and therefore defendants' motion will be denied.

### I. *History of Case*

We begin by noting that nearly every fact asserted by one party is disputed by the other. The record reveals a history of animosity between the two branches of the Berkman family. It is not surprising, therefore, that both parties have approached the instant dispute with fervor. For example, defendants' "Statement of Undisputed Facts" contains the following: "This is nothing more than a case where plaintiffs, with the benefit of 20/20 hindsight, seek to ratify their mistaken business judgment and reap a windfall profit at the expense of defendants." Defendants' Reply Memorandum at 8. Similarly, plaintiffs display their zeal by informing the court of the following "fact": "In this case, defendants used their controlling position in ACC vindictively, to punish plaintiffs for perceived slights and wounds of the past." Plaintiffs' Memorandum at 5. Some facts do emerge.

Prior to the sale of the stock in question, plaintiffs owned or held a total of 1,018,540 shares, equal to about 21 percent of ACC's common shares. Before the sale, defendants, Jack and Myles Berkman, owned a total of 747,596 shares of Class A and Class B stock. Under a 1978 agreement, the Jack Berkman family was empowered to nominate two-thirds of ACC's board of directors and the Louis Berkman family was empowered to nominate one-third. The board has consisted of two representatives of the Jack Berkman family, Jack and Myles, and one representative of the Louis Berkman family, Louis. Also under the 1978 agreement, the Jack Berkman family held a right to purchase any ACC stock that the Louis Berkman family desired to sell before any sale could be made to a third party. This right of purchase by the Jack Berkman family was subject to the corporation's right of first refusal.

Plaintiffs allege that, in late 1983, they began to consider selling their stock. Plaintiffs then notified ACC and the Jack Berkman family of their intention to sell. To determine a fair purchase price, negotiations between the two families ensued. The parties disagree as to the terms and timing of preliminary offers and rejections, but it is clear that the parties signed a stock purchase agreement on June 5, 1984. The agreement provides for the sale of

1,018,540 shares of ACC stock at $10 per share. The complaint alleges that, pursuant to the agreement, ACC purchased from plaintiffs 72,000 shares on June 28, 1984, and 473,270 shares on December 12, 1984. The agreement also provides for the purchase of plaintiffs' remaining 473,270 shares at $10 a share on June 26, 1985. It appears that plaintiffs have not tendered these remaining shares.

Sometime after December 12, 1984, plaintiffs allege they discovered that defendants concealed the fact that ACC had been negotiating with a third party, KISS Limited Partnership (KISS), to sell most of ACC's eleven radio stations at a substantial price. Discovery to date indicates that the KISS negotiations were serious and ongoing in May 1984, a month before the stock purchase agreement was signed. The parties hotly contest the date on which an agreement in principle was reached for the sale of the eight radio stations to KISS.

The sale of eight radio stations was publicly announced on August 3, 1984, defendants allege. The purchase price was $29.5 million in cash and notes. The market price at ACC stock rose dramatically after the sale of the stations was announced. On June 5, 1984, when plaintiffs agreed to sell their stock, the bid price was $9 a share. On the first day of trading after the sale was announced, the bid price rose to $13.37. At the time the complaint was filed, the bid price was approximately $20.50. By agreeing to sell their stock at $10 a share, plaintiffs allegedly lost nearly $18 million.

Seeking rescission of the stock purchase agreement, plus compensatory and punitive damages, plaintiffs filed a six-count complaint on February 12, 1985. Plaintiffs claim that defendants had a duty to disclose material facts relating to the negotiations for the sale of the radio stations. Plaintiffs also claim that a press release of June 5, 1984, issued by defendants, was false and misleading in that it failed to disclose that KISS had offered to buy substantially all of ACC's radio stations at a high price. In addition, plaintiffs claim the statement falsely represented that increased bank borrowings would be necessary, when in fact defendants planned to use the proceeds of the sale of the radio stations to purchase plaintiffs' stock and to pay off a large portion of ACC's outstanding loans.

Defendants have asserted counterclaims for anticipatory breach of the stock purchase agreement and for declaratory relief. Defendants, Jack and Myles Berkman, also filed a third-party complaint against Louis and Marshall Berkman for contribution.

II. *Summary Judgment Motion*

After extensive discovery by both parties, defendants have moved for summary judgment. In support of their motion, defendants make two arguments. First, defendants had no obligation or duty to disclose to plaintiffs that ACC was engaged in preliminary negotiations to sell eight of its radio stations before plaintiffs agreed to sell their stock. Second, plaintiffs ratified the stock purchase agreement when they accepted $4,732,700 in cash for their stock more than four months after they first learned of defendants' alleged fraud. Both arguments are directed against plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934 and Securities Exchange Commission Rule 10b–5. Defendants also contend that, if summary judgment is granted as to the federal claims, the state law claims should be dismissed for want of subject matter jurisdiction, citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

A motion for summary judgment may be granted only if there are no issues of material fact which, if believed by the trier of fact, would justify a finding for the party opposing the judgment. *Wahl v. Rexnord, Inc.*, 624 F.2d 1169 (3d Cir.1980). All evidence must be viewed in a light most favorable to the party opposing the motion, and every reasonable inference must be afforded to the opposing party. *Sanford v. O'Neill*, 616 F.2d 92 (3d Cir.1980). A movant must make a "clear showing" that no genuine issue of any material fact remains

for trial. *Ely v. Hall's Motor Transit Co.,* 590 F.2d 62, 66 (3d Cir.1978).

### A. *Duty To Disclose and Materiality*

The issue presented by defendants' first argument is whether defendants had a duty to disclose to plaintiffs inside information pertaining to the ACC–KISS negotiations before defendants agreed to purchase plaintiffs' stock.

Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 prohibit the use, in connection with the purchase or sale of any security, of any manipulative or deceptive device with the intent to defraud or deceive. Rule 10b–5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1983).

■ The rule imposes a duty on corporate insiders to disclose, prior to trading, material information. *Chiarella v. United States,* 445 U.S. 222, 230, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980). Material information consists of those facts that a reasonable investor might have considered as important in making a decision to buy or sell. *Rochez Brothers, Inc. v. Rhoades,* 491 F.2d 402, 410 (3d Cir.1974), *cert. denied,* 425 U.S. 933, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976); *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972).

■ Section 10(b) and Rule 10b–5 were enacted and promulgated in response to the long-held policy of a free and open securities market, where no investor is free to capitalize on his/her position as a corporate insider by benefitting through the fraudulent use of material nonpublic information. *Chiarella, supra,* 445 U.S. at 230, 100 S.Ct. at 1115. Insiders are bound to disclose material nonpublic information or to abstain from trading. *Dirks v. S.E.C.,* 463 U.S. 646, 653, 103 S.Ct. 3255, 3260, 77 L.Ed.2d 911 (1983).

■ Defendants argue that the undisclosed information dealt with preliminary negotiations for the sale of corporate assets and that such information is not "material" within the meaning of Section 10(b) and Rule 10b–5. In support of their contention that no duty arises to disclose preliminary negotiations, defendants rely on *Greenfield v. Heublein, Inc.,* 742 F.2d 751 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985), and *Staffin v. Greenberg,* 672 F.2d 1196 (3d Cir.1982).

In *Greenfield,* a class comprised of individual investors claimed that a target corporation and its takeover corporation violated Section 10(b) and Rule 10b–5 by withholding information concerning takeover discussions. The Court of Appeals, citing *Staffin, supra,* held that "where an agreement in principle to merge has been reached a duty to disclose does exist." *Greenfield, supra* at 756. Applying that rule, the court held that a duty to disclose a merger agreement arises where there has been a "fundamental agreement on the *price and structure* of a merger." *Greenfield, supra* at 756. (Emphasis in original). Defendants argue that a fundamental agreement on price and structure of the deal with KISS was not reached before July 26, 1984, and that the KISS negotiations were not material on the date of the stock purchase agreement as a matter of law.

Contrary to defendants' repeated assertions, *Greenfield* is not dispositive. In the opinion, Chief Judge Aldisert twice limited

the holding to merger discussions. 742 F.2d at 753, 755. *Greenfield* does not, even arguably, address when the duty to disclose arises in the context of negotiations for the sale of assets. Indeed, any comparison between Heublein, Inc. and ACC would be strained because Heublein was taken over by another corporation while ACC, by all indications, remains a strong and viable concern.

Moreover, we note that the policy considerations underlying the test adopted by the Court of Appeals in the merger context are not applicable in the sale of asset context. The policy considerations justifying nondisclosure, that is, until an agreement has been reached on the price and structure of a merger, were described in *Staffin* as follows:

> A company intending to make a tender offer strives to keep its plans secret. If word of the impending offer becomes public, the price of the stock will rise towards the expected tender price. Thus, the primary inducement to stockholders—an offer to purchase their shares at an attractive price above the market—is lost, and the offeror may be forced to abandon its plans or to raise the offer to a still higher price.

672 F.2d at 1206. However, disclosure of negotiations to sell corporate assets would not itself thwart the transaction. The potential buyer would not be dissuaded in any way by a rise in the selling corporation's stock value. The buyer is merely negotiating a fair price for the assets, not for the corporation itself.

Further, disclosure of a buyer's lucrative offer to purchase some corporate assets would not harm the corporation or undermine Rule 10b–5's goal of protecting "the basic integrity and fairness of the exchange markets." *Greenfield, supra* at 756. Such a disclosure would harm only those having inside information and intending to participate in a sale or purchase of stock. The precise target of Rule 10b–5.

The Securities Exchange Act and regulations thereunder reflect a Congressional policy of full and fair disclosure of material information so that the investor may participate in a free and open market. The purpose of the 1934 Act and SEC regulations is "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor.*" *Sante Fe Industries, Inc. v. Green*, 430 U.S. 462, 477, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977). Given these policies, we hold that *Greenfield's* standard for limited disclosure is not controlling.

Having found that *Greenfield* and *Staffin* are inapplicable, we must determine whether the information was "material" under Section 10(b) and Rule 10b–5. The statute and regulation do not define "material." The Supreme Court has defined the term in the context of SEC Rule 14a–9, governing the information that must be disclosed in proxy statements. In *TSC Industries, Inc. v. Northway, Inc.*, the Court stated that:

> [T]he general standard of materiality ... contemplate[s] ... a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

The Supreme Court's definition has been applied by the Court of Appeals in the recent case of *Rothberg v. Rosenbloom*, 771 F.2d 818 (3d Cir.1985) to a claim of fraudulent nondisclosure under Rule 10b–5. *See also Staffin, supra* at 1205. Also, information dealing with the sale of corporate assets has been held to be material in *Kidwell ex rel. Penfold v. Meikle*, 597 F.2d 1273 (9th Cir.1979), and *Swanson v. American Consumer Industries*, 415 F.2d 1326 (7th Cir.1969); *see also* Hazen, Law of Securities Regulation, § 13.5 (1985).

We decline to hold, as a matter of law, that the information known by defendants was not material within the meaning of

Section 10(b) and Rule 10b–5. The evidence of record establishes that KISS had made substantial overtures to buy eight of ACC's radio stations in May 1984, a month before plaintiffs signed the stock purchase agreement. Defendants' Exhibit E. (Whether the KISS letter represents an "offer" in the legal sense is irrelevant in determining materiality because the letter indicates a severe underestimation by ACC of the value of assets.) If plaintiffs had known that the eight radio stations were worth more than $20 million on the open market, their willingness to sell ACC stock at $10 a share may have been affected. *Rothberg, supra* at 821.

Plaintiffs have alleged, and testified by deposition that knowledge of the KISS negotiations and the potential sale price of the stations would have affected their decision to sell ACC stock. Complaint at paragraph 53. Defendants have failed to make a "clear showing" that such information would not have been material to plaintiffs' decision to sell. *Ely, supra*, 590 F.2d at 66. Because, as the Supreme Court held in *TSC Industries, supra*, 426 U.S. at 450, 96 S.Ct. at 2133, materiality under the securities laws is "peculiarly" a question "for the trier of fact," we decline to grant judgment on the basis that the information regarding the sale of the radio stations was not material.

### B. *Waiver and Estoppel*

■ Defendants next contend that plaintiffs are estopped from asserting a claim of fraud under Section 10(b) and Rule 10b–5 because plaintiffs "ratified" the stock purchase agreement when they accepted $4,732,700 in cash for 473,270 shares on December 7, 1984, four months after the sales were announced. According to defendants, "notwithstanding [plaintiffs'] knowledge of the very wrongdoing alleged in the complaint, which gave rise to a perception of unfairness, and without asking a single question of anyone concerning such alleged wrongdoing, ... plaintiffs chose to accept the multimillion dollar benefits of the transaction and ratified the Stock Pur-

chase Agreement." Defendants' Reply Memorandum at 37.

Defendants are confusing the concepts of estoppel and the affirmative defense of due diligence. The motion now before this court is based on estoppel, that is, plaintiffs' action in abiding by the stock purchase agreement with full knowledge of the material elements of the ACC–KISS transaction. The judgment motion and supporting arguments of defendants are not predicated on the affirmative defense of due diligence, that is, plaintiffs' failure to take reasonable steps to learn and to understand the transaction in question. *Straub v. Vaisman & Co.*, 540 F.2d 591, 598 (3d Cir.1976). We decline to determine whether plaintiffs have failed to exercise due diligence as a matter of law because the issue has not been raised or briefed by the parties.

Turning to the estoppel argument, we find that defendants have failed to make the required "clear showing" that plaintiffs had full and adequate knowledge of the material elements of the ACC–KISS transaction (especially the seriousness of the negotiations in May 1984) when they accepted cash for their stock in December 1984. *Ely, supra* at 66. As permitted by Rule 56(c), plaintiffs submitted opposing affidavits, that they were unaware of the extent of the negotiations between KISS and ACC prior to December 12, 1984, the date that plaintiffs sold their stock on the terms contained in the agreement of June 5, 1984. Whether these statements, made under oath, are probative on the issue of plaintiffs' lack of due diligence, we decline to decide. They are, however, uncontradicted by defendants and dispositive of the issue of estoppel.

### III. *Summary*

Because we find that genuine issues of material fact exist as to whether defendants' nondisclosure of the particulars of the ACC–KISS negotiations was a "material" misrepresentation under Section 10(b) and Rule 10b–5, and because genuine issues of material fact exist as to whether plaintiffs' acceptance of cash for their stock in De-

**644**

cember 1984 was with full knowledge of the alleged fraud in June 1984, defendants' motion for summary judgment will be denied.

A written order will follow denying the motion of defendants for summary judgment.