## In re NUMEREX CORPORATION SECURITIES LITIGATION.

### Civil A. No. 95–4378.

United States District Court, E.D. Pennsylvania.

Jan. 24, 1996.

---

Sherrie R. Savett, Berger & Montague, Philadelphia, PA; Stuart Savett, Savett, Frutkin, Podell & Ryan, Philadelphia, PA; and Jules Brody, Stull, Stull & Brody, New York City, for plaintiffs.

Elizabeth Hoop Fay, Morgan, Lewis & Bockius, Philadelphia, PA, for defendants Gwynedd Resources Ltd. and Richard L. Mooers.

Alexander D. Bono, Blank, Rome, Comisky & McCauley, Philadelphia, PA, for defendants Numerex Corporation, Eugene J. White, Frederick C. Shay, Charles L. McNew, Kenneth F. Manser, and Matthew J. Flanagan.

Mark J. Levin, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, PA, for defendants Prudential Securities, Inc. and Prudential–Bache Securities, Inc.

## MEMORANDUM

DALZELL, District Judge.

Disappointed investors filed three putative class action suits in this Court in connection with a public offering of Numerex Corporation ("Numerex") common stock. After we consolidated the cases under the above caption, plaintiffs filed an amended complaint alleging violations of the Securities Act of 1933. Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] For the reasons that follow, we shall grant the motion.

### I. Background

#### A. Numerex Corporation

The allegations of the consolidated amended complaint, which we assume to be true, are as follows. Numerex is a Pennsylvania corporation that designs, manufactures and markets its proprietary derived channel system ("DCS"), enabling telephone companies to transmit data to perform alarm reporting and other monitoring functions without interfering with regular voice communications. Cmplt. ¶ 5a. Numerex's derived channel products include network equipment sold to telephone companies as well as related subscriber terminal units sold to alarm system distributors and installers for use at protected premises. *Id.* To complement its DCS business, Numerex also offers a family of intrusion alarm products, such as control panels and detection and communication devices, and a line of network management products used to test and monitor the perfor-

---

1. On a motion to dismiss for failure to state a claim upon which relief can be granted, we must take all allegations contained in the complaint as true and construe them in a light most favorable to the plaintiffs. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249, 109 S.Ct. 2893, 2905, 106 L.Ed.2d 195 (1989); *Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir.1989). We may grant the motion only if it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Frazier v. Southeastern Pa. Transp. Auth.*, 785 F.2d 65, 66 (3d Cir.1986). In this procedural posture, we may consider the complaint, any attached exhibits, matters of public record, orders and other items appearing in the record, *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 & n. 2 (3d Cir.1994), including the allegedly actionable prospectus and registration statement. *In re Donald J. Trump Casino Secs. Litig.*, 7 F.3d 357, 368 n. 9 (3d Cir.1993), *cert. denied,* ── U.S. ──, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).

mance of data and voice communication networks. *Id.*

Since 1992, Numerex's revenues and profits significantly increased as a result of acquisitions and internal growth, primarily in its main United Kingdom market. *Id.* ¶ 18. From 1992 to 1994, Numerex acquired several companies and the right to sell DCS technology (which had been responsible for Numerex's growth in the United Kingdom) in North and South America, the Pacific Rim and Eastern Europe. *Id.* ¶¶ 19–20. Although these acquisitions broadened its product lines and geographic markets, Numerex still derived the bulk of its revenues from the United Kingdom. *Id.* ¶ 21. In fact, 55% of sales in 1993, 48.6% of sales in 1994 and 39.4% of sales in the first fiscal quarter ending January 31, 1995, were to a single customer, British Telecom. *Id.* Such sales consisted of network equipment that British Telecom deployed in connection with its Red-CARE alarm reporting service to customers including McDonald's, Burger King, 7-Eleven, Thomas Cook and Barclays Bank. *Id.* So vital is its U.K. market that Numerex published its financial statements in British pounds sterling. *Id.*

On December 19, 1994, Numerex announced its earnings and revenues for the fiscal year ending October 31, 1994. *Id.* ¶ 22. Numerex reported that revenues more than doubled to $34,722,000 from $16,832,000 the prior year. *Id.* Net income and earnings per share for the year also increased to $9,622,000 and $1.01, from $4,029,000 and $.57, respectively, from the prior year. *Id.* Numerex stated that these increases resulted from continued expansion of the U.K.-based DCS network and a related rise in the sales of subscriber terminal units and intrusion alarm products. *Id.* On February 28, 1995, Numerex reported "record results" for three months ending January 31, 1995, a quarter that historically "tends to be lower" than others. *Id.* ¶ 23.

On the same day that it released its quarterly financial information, Numerex announced that it had filed a registration statement for the public offering at issue in this case. *Id.* ¶ 24.

### B. The Public Offering

Before March 3, 1994, there had been no public market for Numerex shares. Cmplt. ¶ 5b. From March 3, 1994 to April 20, 1995, only 312,500 shares of the 9,634,992 shares of Numerex stock outstanding were freely tradeable in the public NASDAQ small capital market, while the remaining 9,322,492 shares were restricted and did not trade. *Id.*

On April 21, 1995, Numerex issued a registration statement, and a prospectus contained therein, for sale to the public of 3,750,-000 shares of common stock at $15 per share. *Id.* ¶ 2a. Numerex sold 1,875,000 shares and Gwynedd Resources, Ltd. ("Gwynedd") sold an equal number.[2] *Id.* ¶ 2a. In addition, there was an over-allotment option of 562,500 shares. *Id.* Several Numerex officers and directors were signatories to the registration statement and are named as defendants.[3] The underwriting of the public offering was managed and syndicated by two securities broker/dealers, Prudential Securities Inc., the managing underwriter for the shares being offered in the United States and Canada, and Prudential–Bache Securities, the managing underwriter for shares sold elsewhere.

---

**2.** Gwynedd is owned entirely by Dominion Holdings, which also owns Dominion Group Limited, an investment and merchant banking firm that provided financial banking services to Numerex. Prospectus at 8–9. Gwynedd owned 55% of Numerex common stock before the public offering and 29.8% afterwards. *Id.* at 9. Richard L. Mooers, a Numerex director, is a director and officer of both Gwynedd and Dominion. *Id.* By agreement, Gwynedd has the right to designate a Numerex director so long as it owns 10% of the company. *Id.*

**3.** The officers named as defendants are Eugene J. White (chairman of the board since March 1994 and president and chief executive officer since April 1994, who resigned in June of 1995), Charles L. McNew (vice president and chief financial officer since July 1994), Frederick C. Shay (director since February 1994 and president of DCX Systems subsidiary since November 1994), Kenneth F. Manser (managing director of Versus Technology UK subsidiary since December 1990 and director since February 1994), Richard L. Mooers (director since October 1994 and director of corporate finance since August 1991) and Matthew J. Flanigan (director since July 1994). Cmplt. ¶¶ 8–13.

*Id.* ¶ 2b. The defendant underwriters ultimately sold 3,925,000 shares in the public offering. *Id.* ¶ 2a.

After April 21, 1995, the shares sold in the public offering and the 312,500 previously-traded shares were listed on the NASDAQ National Market System. *Id.* ¶ 5c. Thus, of the 4,237,500 Numerex shares held in public hands, over 92.6% are directly traceable to the public offering. *Id.* Plaintiffs purchased Numerex common stock in the public offering pursuant to the registration statement and prospectus.[4] *Id.* ¶¶ 4a–d.

On June 29, 1995, only two months after the public offering, defendant Eugene J. White, Numerex's Chairman of the Board since March of 1994 and its President and Chief Executive Officer since April of 1994, resigned from all of his positions with Numerex. *Id.* ¶¶ 8, 35. In his announcement, White stated, "[a]fter taking the Company public, completing three strategic acquisitions as well as successfully completing a recent public offering, it is time to move on." *Id.* ¶ 35.

On July 12, 1995, after the market had closed, Numerex announced that a temporary slowdown in business within the U.K. alarm industry had led to lower-than-expected demand for its derived channel products. *Id.* ¶ 36. The next day, the price of Numerex common stock fell 31.9% from $11.375 to $7.75.[5] *Id.* ¶ 39. Trading on volume of 769,400 shares was more than eight times heavier than the prior three days' average. *Id.*

The day after this precipitous drop in the price of Numerex stock, the first suit was filed. *Gross v. Numerex Corp.*, No. 95–4378 (filed July 14, 1995).[6]

## II. *Analysis*

Count I of the two-count consolidated amended complaint alleges violations of § 11[7] of the Securities Act of 1933 against Numerex, the officers who signed the registration statement, the underwriters, and Gwynedd Resources, Ltd., and violations of § 15[8] against the individual defendants and Gwynedd. Count II claims violations of

---

4. Although plaintiffs allege that they purchased their securities in the public offering, they seek to represent a class that includes those "who purchased shares on the open market". Cmplt. ¶ 16. Defendants question plaintiffs' standing to sue on behalf of the after-market class members. Mtn. at 35 n. 15. For the purposes of this motion only, we shall assume that plaintiffs' shares did not come from the secondary market and that the shares can be sufficiently traced to the prospectus. *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 287 n. 16 (3d Cir.), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992).

5. Numerex closed yesterday at $4⅝. *Wall Street Journal*, Jan. 24, 1996, at C10.

6. David Gross is a seasoned class action champion. Represented by the Stull, Stull & Brody firm as he is here, Gross was the named plaintiff in two other putative class action suits against technology companies. Reply at 5 n. 6. (citing *In re MTI Technology Sec. Litig.*, No. SACV 94–588–LHM (EEx) (C.D.Cal.1994); *Gross v. Summa Four, Inc.*, No. C–94–364–B, 1995 U.S.Dist. LEXIS 16613 (D.N.H.1995) (granting 12(b)(6) motion)).

7. Section 11(a) of the 1933 Act provides, in relevant part:

   (a) In case any part of the registration statement, when such part became effective, con-

tained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue—(1) every person who signed the registration statement; (2) every person who was a director of ... the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted; ... (5) every underwriter with respect to such security. . . .

   15 U.S.C. § 77k(a).

8. Section 15 of the 1933 Act provides:

   Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

§ 12(2) [9] against Numerex, Gwynedd and the underwriters and violations of § 15 against the individual defendants and Gwynedd. Notably, plaintiffs do not allege that defendants acted with the intent to defraud them in violation of § 10(b) of the Securities Act of 1934. *Cf. In re U.S. Bioscience Secs. Litig.*, 806 F.Supp. 1197, 1201 (E.D.Pa.1992).

Defendants have, as noted, moved to dismiss, contending that (1) no material misrepresentations exist as a matter of law because the forward-looking statements in the prospectus are not actionable (a) under the "bespeaks caution" doctrine, (b) as mere "puffing", or (c) as claims for mismanagement; (2) the complaint fails to allege adequately that defendants are statutory "sellers" under § 12(2); and (3) the consolidated amended complaint fails to satisfy the particularity requirement of Federal Rule of Civil Procedure 9(b).

The Supreme Court has identified the distinguishing features of a cause of action under § 11 of the 1933 Act:

> Section 11 of the 1933 Act allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement. The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of

liability on the parties who play a direct role in a registered offering. If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements. Other defendants bear the burden of demonstrating due diligence.

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983) (footnotes omitted). In contrast, "[u]nder § 12(2) of the Securities Act of 1933 buyers have an express cause of action for rescission against sellers who make material misstatements or omissions 'by means of a prospectus.'". *Gustafson v. Alloyd Co., Inc.*, — U.S. —, —, 115 S.Ct. 1061, 1064, 131 L.Ed.2d 1 (1995). This provision applies only to initial distributions and not to securities purchased on the after-market. *Id.* at —, 115 S.Ct. at 1074; *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 692–93 (3d Cir.), *cert. denied*, 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991). Section 15, in turn, imposes liability upon a "controlling person" who has direct or indirect power over the management or policies of another entity and is thus liable to the same extent under § 11 or § 12(2) as the other entity. *Trump*, 7 F.3d at 366 n. 5; *Shapiro*, 964 F.2d at 279.

15 U.S.C. § 77o.

**9.** Section 12(2) of the 1933 Act was recently amended by the Private Securities Litigation Reform Act of 1995. Section 12(2), with the amended portions underscored, now provides that:

> *(a) IN GENERAL.*—Any person who—offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, *subject to subsection*

> *(b)*, to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
> *(b) LOSS CAUSATION.—In an action described in subsection (a)(2), if the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication, with respect to which the liability of that person is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading, then such portion or amount, as the case may be, shall not be recoverable.*

15 U.S.C. § 77l(2), *amended by* Pub.L. 104–67, § 105, 109 Stat. 737, 757 (Dec. 22, 1995). The underscored portion is set forth merely for completeness' sake since, by its terms, the Act does

### A. "Bespeaks Caution" Doctrine

Under the securities law provisions plaintiffs cite, any alleged misstatement or omission must be material. *Trump*, 7 F.3d at 368 n. 10; *Craftmatic Secs. Litig. v. Kraftsow*, 890 F.2d 628, 641 n. 18 (3d Cir.1989).[10] A "fact is material if there is a substantial likelihood that a reasonable [investor] would consider it important in deciding" whether to purchase shares. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).[11] Although materiality is a mixed question of law and fact ordinarily left to the trier of fact, "if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality [it is] appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Shapiro*, 964 F.2d at 280 n. 11.

■ In determining materiality, we must view a statement not in a vacuum but in the context of the entire document. *Trump*, 7 F.3d at 369. The duty to read a statement in its setting has given rise to the "bespeaks caution" doctrine, which provides,

> when an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the "total mix" of information the document provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.

*Id.* at 371. The bespeaks caution doctrine merely restates the unremarkable proposition that "[w]hile a misleading statement will not always lose its deceptive edge simply by joinder with others that are true, the true statements may discredit the other one so

obviously that the risk of real deception drops to nil." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097, 111 S.Ct. 2749, 2760, 115 L.Ed.2d 929 (1991). As an analytical matter, the doctrine is equally applicable to allegations of both affirmative misrepresentations and omissions concerning soft information. *Trump*, 7 F.3d at 371.

■ In order to render "inactionable" any allegedly misleading or false statement, the cautionary statements must be directly related to the material upon which the investors claimed to have relied. *Kline v. First W. Gov't Secs., Inc.*, 24 F.3d 480, 489 (3d Cir.), *cert. denied sub nom. Arvey, Hodes, Costello & Burman v. Kline*, — U.S. —, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994). A boilerplate disclaimer that merely "warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." *Trump*, 7 F.3d at 371–72. Of course, our ultimate inquiry is whether a "reasonable jury could conclude that the subject projection materially influenced a reasonable investor." *Id.* at 373 (footnote omitted).

### B. The Alleged Material Misstatements in the Prospectus

Plaintiffs point to a number of statements in the prospectus that they claim are false or misleading. Because our analysis depends on the actual language employed, as opposed to plaintiffs' characterizations of such, we shall quote in full every statement that plaintiffs allege is false or misleading.

#### 1. *Profit Growth*

■ The consolidated amended complaint alleges that Numerex "boasted about ...

---

not apply to pending actions. *Id.* § 108, 109 Stat. 737, 758.

**10.** While the cited cases do not explicitly declare that materiality is an element of a § 15 claim, to the extent that liability under § 15 is derivative of the other provisions based upon a defendant's status as a "controlling person", § 15, too, requires a misrepresentation or omission of a ma-

terial fact. *Shapiro*, 964 F.2d at 279 ("If no controlled person is liable, there can be no controlling person liability.").

**11.** Although the Court in *TSC* addressed Rule 14a–9, promulgated under § 14(a) of the 1934 Act, its holding is instructive here because, as stated, materiality also an element of the causes of action plaintiffs cite. *See* n. 10, *infra*.

continuous growth in profits and sale" "[i]n order to portray [Numerex] and the proposed stock investment in the most favorable light", when it stated,

> Since 1992, the Company has experienced a substantial increase in revenues and profits due both to internal growth and to recent acquisitions.

Cmplt. ¶ 26 (quoting Prospectus at 3 & 23). This declaration is neither a "boast" nor some artifice to inflate the value of the stock, but rather is a fair and accurate summary of the company's then-recent financial history. Defendants' choice of the adjective "substantial" is "inactionable" because Numerex's revenues and profits *have* increased substantially since 1992. Prospectus at 5 & 16; *compare TSC*, 426 U.S. at 459, 96 S.Ct. at 2137 (holding that phrase "substantial premium over current market values" is not materially misleading as a matter of law where premium was 14%). Paragraph 26 is not a material misstatement since it is not a misstatement in the first place and thus cannot predicate any liability.

### 2. *British Telecom*

■ According to the complaint, Numerex "misrepresented or failed to disclose, among other things, that Numerex's relationship with its principal customer, British Telecom, was undergoing a re-evaluation and could result in delayed or declining sales." *Id.* ¶ 33. The complaint claims that defendants thus "created the false impression that the dramatic growth experienced by Numerex ... would continue at rates comparable to those experienced in the past", especially since Numerex "knew or should have known" what its sales trends were in the UK because British Telecom was required, under the terms of their agreement, to provide rolling forecasts of the quantity of equipment likely to be ordered during specific periods. *Id.* ¶¶ 37–38.

This is precisely the sort of "soft information", *i.e.*, "subjective analysis or extrapolation, such as opinions, motives, and intentions, or forward looking statements, such as projections, estimates, and forecasts", that our Court of Appeals addressed in *Trump*. 7 F.3d at 368 n. 11 (quoting *Craftmatic*, 890

F.2d at 642). As in *Trump*, the prospectus here contains sufficient cautionary warnings to render the alleged misstatements "harmless." *Id.* at 371. The second risk factor disclosed on page six of the prospectus details Numerex's reliance upon British Telecom and warns of the potential harm to the company's well-being that a change in the relationship would present:

*Dependence Upon British Telecom.* Direct sales to the Company's major customer, British Telecom, accounted for approximately 48.6% and 55.0% of the Company's sales for the fiscal years ended October 31, 1994 and 1993, respectively and approximately 39.4% of the Company's sales for the three months ended January 31, 1995. Such sales consisted of network equipment deployed by British Telecom in connection with its RedCARE alarm reporting service. *The Company's agreement to supply certain network equipment to British Telecom relating to its RedCARE service will expire on September 30, 1995.* Under such agreement, British Telecom is not required to purchase any minimum amount of equipment. *There can be no assurance that a new agreement will be entered into by the parties at the end of the term.* In addition to direct sales to British Telecom, a substantial majority of the Company's remaining Derived Channel System sales consists of STUs sold to alarm system distributors and installers for resale to British Telecom's RedCARE subscribers. The Company is dependent upon the marketing efforts of British Telecom to generate demand for the enhanced alarm reporting service, which in turn results in sales of the Company's network equipment to British Telecom and customer premises equipment (STUs) to alarm system distributors and installers. There can be no assurance that British Telecom will take any further steps to increase the market penetration of its RedCARE service by attracting additional subscribers or by offering its RedCARE service in new regions of the United Kingdom or that any market development or geographic expansion efforts undertaken by British Telecom will be successful. In the event that British Telecom fails to attract additional Red-

CARE subscribers or does not otherwise expand its RedCARE service in the United Kingdom, the Company's sales of Derived Channel System products would be expected to decrease over time. *A reduction of sales to British Telecom, a reduction by British Telecom in its marketing efforts for its RedCARE service, a failure by British Telecom to offer its RedCARE service in new regions, or an impairment of British Telecom's ability to add new subscribers for its RedCARE service, would have a material adverse effect on the Company.*

Prospectus at 6 (emphasis added).

Any reasonably prudent investor reading this prospectus in its entirety would recognize the risks inherent in a company that depends upon one purchaser for almost half of its sales. Unlike the excerpted statements in the complaint, which are general descriptions of the company's objectives, the cautionary statements concerning Numerex's reliance upon British Telecom are grounded in unambiguous, specific terms in a prominent display in the prospectus. Furthermore, contrary to plaintiffs' assertions, Numerex did warn that its relationship with British Telecom was "undergoing a re-evaluation" when it stated that their contract was about to expire. Cmplt. ¶ 33.

### 3. *Global Expansion Strategy*

■ Additionally, plaintiffs claim, without specifically pointing to any statement, that "defendants stated in the Prospectus that the Company had developed a successful business strategy for operating Numerex, particularly for its critically important British market and the transfer of this technology and plan to develop sales in the larger North American and Pacific Rim markets." *Id.* ¶ 27. Presumably, plaintiffs were referring to the lengthy quote from the prospectus set forth in the following paragraph of the complaint:

The Company believes that its recently completed strategic acquisitions, particularly the acquisition of the rights to market its Derived Channel System in North America and several other markets, have positioned the Company for future worldwide growth.

The Company's primary strategic objectives are to increase the number of telephone company subscribers using existing derived channel products and to sell additional Derived Channel Systems to telephone companies. The Company's largest customer, British Telecommunications plc ("British Telecom"), has been successful in implementing the Company's Derived Channel System by offering British Telecom's "RedCARE" enhanced alarm reporting service to customers through its telephone network in the United Kingdom. In addition, the Company recently acquired the rights to market its Derived Channel System in North America and several other worldwide markets. Along with these rights, the Company has assumed customer relationships with six of the seven Regional Bell Operating Companies and GTE Corporation in the United States, each of which has purchased and installed systems using earlier versions of the derived channel technology. Building upon the success of the British Telecom RedCARE system, the Company believes it is well positioned to increase the number of telephone company subscribers of existing systems using derived channel products and to sell new Derived Channel Systems to telephone companies in the United States and various other worldwide markets.

*Id.* ¶ 28 (quoting Prospectus at 3 & 23).

As to plaintiffs' contentions regarding Numerex's plan to open new worldwide markets, the prospectus contains corresponding caveats that serve to warn the average investor of the risks of such expansion:

*Risks of the Company's Geographic Expansion Program.* To date, a substantial majority of the Company's revenues has been generated from product sales within the United Kingdom. The Company has undertaken efforts to increase its market penetration in North America and the Pacific Rim and to expand into other parts of Western Europe. Each country typically has its own technical certification and network standards, local distribution channels, and local competitive dynamics. In order for the Company's expansion efforts to be successful, the Company's products will

need to be selected for use in the new geographic markets by telephone companies and alarm system distributors and installers. *There can be no assurance that the Company's products will be selected for deployment in these markets or that the Company will be able to successfully expand into new geographic markets.* Unless, and until, the Company is able to generate new sales from these efforts, *the start-up costs and other expenses arising from the Company's expansion activities may adversely affect the Company's future results of operations.* The Company has no current intention to market its intrusion alarm products in the United States.

Prospectus at 6–7 (emphasis added). This cautionary language suffices to negate as a matter of law any allegedly misleading misrepresentations concerning the company's plan to develop sales worldwide.

### 4. *Growth in the British Market and Volatility*

■ Plaintiffs further allege that Numerex attempted "[t]o foster the illusion of continued growth in the Company's all-important British market for its derived channel products" when stating,

> In an effort to better manage underwriting risk, insurance companies, especially in the United Kingdom, have begun requiring commercial and high-end residential users to incorporate security systems meeting certain specifications, such as a line interrupt detection capability, as a condition to providing insurance.

Cmplt. ¶ 29 (quoting Prospectus at 24). The complaint continues,

> The Company's largest customer, British Telecom, has been successful in implementing the Company's Derived Channel System by offering RedCARE, an enhanced alarm reporting service, through its telephone network in the United Kingdom. The RedCARE system is available in approximately 75% of British Telecom's telephone exchanges, including London, Manchester and Birmingham, England, and the Company believes that British Telecom plans to extend the availability of the service to other areas of the United

Kingdom. There are approximately 155,-000 RedCARE subscribers, most of which are commercial subscribers. British Telecom currently charges commercial subscribers £154 per year for basic RedCARE service.

> While the Company believes that its Derived Channel System has been used primarily in the commercial sector, management believes that growth potential exists in both the commercial and residential sectors. Industry sources estimate that there are approximately 500,000 alarm systems with communication capabilities (of which approximately 30% are presently RedCARE customers) of a total 2.5 million alarm systems installed in the United Kingdom. The Company believes that additional United Kingdom growth opportunities are available in the fire alarm reporting, telemetry and energy management markets.

Cmplt. ¶ 30 (quoting Prospectus at 24). Plaintiffs contend that it was "misleading" for Numerex to have made these positive statements regarding the expansion of its DCS sales and growth of its monitoring applications, because there was no disclosure that revenues "were subject to sudden and drastic changes in quarterly revenue." *Id.* ¶ 37.

The federal securities laws were intended to protect the average, reasonable investor, not the most unworldly naïf. They do not require a company to state the obvious. *Trump,* 7 F.3d at 377. It should be obvious to any reasonable investor that a company that has been operating only since July 1992 could face fluctuations in its operating results. *See* Prospectus at 6 (Limited Operating History as a Risk Factor). Even if it were not so obvious, Numerex explicitly warned investors that "[t]he Company's financial results may fluctuate from quarter to quarter as a result of a number of factors, including the timing of product shipments and new product introductions as well as certain major network equipment software sales to telephone companies that historically have been of a non-recurring nature." *Id.* at 20.

Numerex's volatile operating history is further reflected in a chart of the quarterly price range of its stock. For example, in its second fiscal quarter of 1994, the price of Numerex stock fluctuated between a high of $12.40 and a low of $4.00, a difference of 310%. The prospectus details this price history at 13. Although the stock price levelled out in more recent quarters, it still demonstrated a volatility typical of fledgling companies that should have alerted any investor that he was putting his money into a risky venture.

■ The complaint also claims that Numerex was, apparently improperly, "emphasizing the growth in its all-important British market", when it stated that "[b]ased upon [subscriber terminal unit] sales, management estimates that subscribers to the RedCARE service in the United Kingdom have grown at an annual rate of approximately 60% since 1990." Cmplt. ¶ 31 (quoting Prospectus at 20). Plaintiffs also object to the statement that,

> Because of its proprietary technology, the Company is the only provider of derived channel system equipment. The Company believes that its principal competition in the commercial security market consists of alternative methods of monitoring line integrity such as dedicated telephone line service. Although security systems using a dedicated telephone line are considered reliable, they are a more expensive alternative to the Company's Derived Channel System.

*Id.* ¶ 32 (quoting Prospectus at 28). Numerex specifically warned, however, that there are substitutes to its DCS that the market might find more attractive. Prospectus at 7 (Potential Adverse Effect of Competition in Products and Technologies). Moreover, plaintiffs do not contend that the management estimate of the increase in RedCARE subscribers was incorrect, only that it "em-

phasiz[ed] the growth in its all-important British market". Cmplt. ¶ 31. As mentioned, Numerex sufficiently warned of its dependence upon British Telecom so that a reasonable investor would be fully informed and not misled.

### 5. *The Resignation of Mr. White*

■ Finally, plaintiffs allege that, because of his age of sixty-six years, White "must have known" at the time of the public offering of his plans to resign and that this "material fact" was not disclosed in the prospectus. Cmplt. ¶ 35.

To be sure, changes in top management can be material. Arrivals and departures in the executive suite can have immediate positive or negative effects on the market.[12] On the other hand, many changes significant enough for publication in the "Who's News" column of the *Wall Street Journal* are sufficiently unexceptional in corporate life to warrant no market reaction. These realities of the marketplace, which after all is the ultimate locus of the Securities Laws' concern, teach us that the materiality of executive personnel changes must be gauged by the business circumstances of each case.

By this standard, we do not believe that White's departure from Numerex was a material event. White had only been with Numerex for approximately a year when the public offering took place. Prospectus at 37. Unlike three of his colleagues, he had not entered an employment agreement with Numerex. *Id.* at 39–40. There is no suggestion that he brought any peculiarly valuable technical or business expertise to the company.

Our view that White's resignation is immaterial is borne out by the market's treatment of Numerex stock following news of the June 29 resignation.[13] The price of Numerex common stock remained remarkably stable from before White's resignation until July 13, 1995, when the market reacted to the an-

---

12. For examples in just the past week, the market welcomed Stephen Wolf's arrival as USAir's Chief Executive Officer with an over-ten percent increase in the stock price, but Viacom shed almost five percent of its value when Sumner Redstone severed Frank Biondi's ties with the company. Carl Quintanilla & Joann S. Lublin, "USAir Names Wolf, Former UAL Chief, as CEO", *Wall St. J.*, Jan. 17, 1996, at A3; Laura Landro & Mark Robichaux, "Redstone's One–Man Show Opens at Viacom", *Wall St. J.*, Jan. 19, 1996, at B1. USAir common stock rose 1⅛ to 14½, and Viacom's Class B shares fell 1¾ to 37¼. *Id.*

13. From the back issues of the *Wall Street Journal*, we have compiled the history of Numerex's

nouncement that demand for Numerex's DCS products had declined. If White's continued employment at Numerex was as vital to the company's health as plaintiffs imply, then his departure would have caused an immediate and negative reaction to the news of his resignation, but the market responded to his leaving with a shrug.

Even if White's resignation could, in some hypothetical sense, be considered material, Numerex specifically warned investors that any departure of·certain executive officers and other "key personnel" could have an adverse effect on the company:

> *Reliance on Key Personnel.* The Company's future performance depends in large part upon the services of certain executive officers and other key personnel. The Company has entered into employment agreements with some, but not all, of such persons. The loss of the services of one or more of these individuals could have an adverse effect upon the Company. The Company's future performance will also depend upon its ability to attract and retain other highly qualified management, engineering, marketing, finance and sales personnel. There can be no assurance that the Company will be able to continue to attract and retain such persons.

Prospectus at 7.

### III. *Conclusion*

Plaintiffs' complaint must be dismissed because the alleged ·misrepresentations and omissions in the prospectus and registration statement are either not material in the first

closing ˙ stock price in the days surrounding White's resignation announced on June 29:

| DATE | CLOSED |
|------|--------|
| 6/23 | 12½ |
| 6/26 | 12 |
| 6/27 | 12 |
| 6/28 | 11¼ |
| 6/29 · | 11¼ |
| 6/30 | 11¼ |
| 7/3 | N/A |
| 7/4 | N/A |
| 7/5 | 10½ |
| 7/6 | 11½ |
| 7/7 | 11⅞ |
| 7/10 | 11½ |
| 7/11 | 11⅜ |
| 7/12 | 11⅜. |

14. Because we have granted defendants' motion on the grounds that the alleged misstatements

place or were made immaterial in the context of surrounding cautionary warnings.[14] We shall therefore grant defendants' motion. An appropriate Order follows.

### ORDER

AND NOW, this 24th day of January, 1996, upon consideration of defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), and the response and reply thereto, and in accordance with the accompanying Memorandum, it is hereby ORDERED that:

1. The motion is GRANTED;

2. The complaint is DISMISSED; and

3. The Clerk of the Court shall CLOSE this case statistically.

and omissions are not actionable either because they are immaterial or because the "bespeaks caution" doctrine insulates them, we need not address their arguments concerning puffing, mismanagement and whether defendants are statutory sellers.

As to defendants' argument that Federal Rule of Civil Procedure 9(b) applies because the complaint "sounds in fraud", plaintiffs respond that they "do not understand how or why Rule 9(b) can apply to a claim in which fraud is not an element". Rsp. at 1 n. 1. Plaintiffs further state that they would have sought Rule 11 sanctions "[w]ere it not for the respect plaintiffs' counsel has for defendants' law offices or the individual defense attorneys involved in this litigation." *Id.* The short answer to why Rule 9(b) applies to §§ 11 and 12(2) claims is that our Court of Appeals said so in *Shapiro.* 964 F.2d at 288.