Otto W. VOIT, III

v.

**WONDERWARE CORP., et al.**

Civil Action No. 96–CV–7883.

United States District Court, E.D. Pennsylvania.

Sept. 8, 1997.

Stanley R. Wolf, Jeffrey M. Krulik, Berger & Montague, P.C., Philadelphia, PA, for Plaintiff.

John G. Harkins, Jr., Eleanor Morris Illoway, David J. Creagan, Harkins Cunningham, Philadelphia, PA, for Defendants.

*MEMORANDUM*

JOYNER, District Judge.

## INTRODUCTION

This action, brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78a *et seq.*, and 17 C.F.R. § 240.10b–5 ("Rule 10b–5") promulgated thereunder, concerns Defendant Wonderware Corp.'s ("Wonderware") purchase of Soft Systems Engineering, Inc. ("SSE"). Plaintiff claims that Defendants' failure to disclose changes in business operations and personnel resulted in inflated values of the Wonderware stock used to purchase SSE. Before the Court is Defendants' motion to dismiss, which we deny for the reasons stated below.

## BACKGROUND

Defendants are Wonderware, a company that develops and markets production management software, and four individuals who are or were executives at Wonderware, Dennis R. Morin, Roy H. Slavin, Norman Farquhar, and Philip J. Huber. Plaintiff Otto W. Voit, III, is a former executive at SSE, a company that Wonderware acquired in August 1995 in exchange for shares of Wonderware stock. Plaintiff alleges the following facts which we accept as true for present purposes.

In June 1995, Wonderware sent SSE a "Letter of Intent for Proposed Acquisition by Wonderware of Soft Systems Engineering, Inc." ("the Letter of Intent"). The Letter of Intent confirmed Wonderware's intention to acquire SSE with cash and approximately $7 million in Wonderware stock. Also in June 1995, Wonderware hired Defendant Slavin as its President and Chief Operating Officer, effective July 1, 1995. In a press release announcing Slavin's hiring, Wonderware quoted Slavin as stating, "I'm really looking forward to working with Dennis [Morin] and the entire Wonderware team." Compl. ¶ 21. The press release further stated: "Dennis R. Morin continues as Chairman of the Board and Chief Executive Officer." *Id.*

During July 1995, Wonderware and SSE negotiated the terms of an "Agreement and Plan of Negotiation" ("the Reorganization Agreement"). At that time Wonderware provided SSE with copies of its Annual Report on Form 10–K for the year ended December 31, 1994; its Quarterly Report on Form 10–Q for the three months ended March 31, 1995; its Proxy Statement for the Annual Meeting of Stockholders on April 17, 1995; and its 1994 Annual Report to Stockholders. Wonderware represented that these documents contained neither untrue statements of material facts nor omissions of material facts necessary to prevent misrepresentation.

The Reorganization Agreement also required Wonderware to advise SSE of "any change that has or had a material adverse effect" on Wonderware and "the occurrence of any event which causes the representations of warranties made by [Wonderware] ... in this Agreement to be incomplete or inaccurate in any material respect." Compl. ¶ 27. The Reorganization Agreement defined the term "material" as "anything which upon public disclosure ... would be viewed by a reasonable investor as significantly altering the total mix of information then available concerning [Wonderware] ..." *Id.* The non-occurrence of any change having a "material adverse effect" was a condition precedent to SSE's obligation to complete the transaction with Wonderware. *Id.* At no

time did Defendants reveal the existence of any changes to SSE.

The Reorganization Agreement provided that Wonderware would use shares of its own stock to buy shares of SSE common stock. Each share of SSE common stock would be converted into that number of shares of Wonderware common stock equal to the Net Aggregate Purchase Price (set at $7 million less certain liabilities of SSE) divided by the average closing price of Wonderware common stock on the Nasdaq National Market System during the twenty trading days immediately prior to the closing date of the merger. Thus, the higher the valuation of Wonderware stock for purposes of the purchase, the better deal Wonderware would achieve in acquiring SSE. SSE and certain of its principal shareholders entered into the Reorganization Agreement with Wonderware.

After entering into the Reorganization Agreement, Wonderware provided SSE shareholders with an "Information Statement for the Special Meeting of SSE Shareholders to be held on August 24, 1995" ("the Information Statement"), as well as its Annual Report on Form 10–K, Quarterly Reports, Annual Report to Stockholders, and Proxy Statement for its Annual Meeting of Shareholders. These documents stated that net income as a percent of revenue was over 20% for 1994 and for the first six months of 1995. Wonderware's documents also contained warning statements regarding the retention of key personnel and regarding potential changes in operations:

> Wonderware's continued success will depend upon its ability to retain a number of key employees. . . . The loss of certain key employees could have a material adverse effect on Wonderware's business.
>
> There can be no assurance that. . . . Wonderware's operating margins can be sustained in the future. . . . Compl. ¶¶ 29, 31.

On August 24, 1995, SSE shareholders unanimously approved the Reorganization Agreement. On August 30, 1995, Wonderware's acquisition of SSE closed, and SSE became a subsidiary of Wonderware. In exchange for their SSE common stock, SSE shareholders were issued an aggregate of 172,598 shares of Wonderware common stock. Additionally, holders of options to purchase SSE common stock were issued options to purchase an aggregate of 8,887 shares of Wonderware common stock. According to the terms of the Reorganization Agreement, Wonderware's stock was valued at $37.075 per share for purposes of the acquisition.

After the acquisition, a number of Wonderware announcements led Plaintiff to bring this action. On October 12, 1995, Wonderware issued a press release reporting that net income as a percentage of revenue for the Third Quarter of 1995 was down to 18.6%. On November 29, 1995, Wonderware announced Morin's resignation and his replacement by Slavin. Within three trading days of this announcement, Wonderware's stock fell from $30.375 to $22.75. On December 6, 1995, Wonderware advised the investment community at a technology conference that changes in the company's operations could substantially decrease the firms profit margins. On December 6th, Wonderware's stock closed near $20 per share. After the conference, Defendant Slavin revealed in a December 8, 1995 press release:

> In July we began taking appropriate steps in our operations to accommodate the transition of the company . . . Recently we have culminated that strategy with the *planned* departure of certain corporate officers and the announcement of aggressive plans for increasing our internal investment in corporate infrastructure . . . This was a transition that *had been planned many months ago* and was formally launched last summer when I joined the Company *as Dennis's hand-picked successor* . . . At the same time we began changing our operations . . . At the December 6th conference we advised that in 1996, reflecting this tactical spending, operating expenses could increase to a level that could change the historical earnings model of the company . . . [Net income, as a percentage of revenue, typically has been around the 20% level . . . [T]his could decrease to the 13% to 17% level.

Compl. ¶ 36 (emphasis added). Following the December 8th press release, Wonderware's stock fell to $15.875 per share.

Plaintiff commenced this action on November 26, 1996. The complaint includes six counts. Count I alleges securities fraud pursuant to Sections 10(b) and 20(a) of the Exchange Act and Rule 10b–5 promulgated thereunder. Counts II through VI assert various state securities and common law claims. Plaintiff contends that Defendants made, or caused to be made, materially false and misleading statements and concealed material information. Specifically, Plaintiff alleges that Defendants knew as early as July 1, 1995, that Slavin would replace Morin as CEO and that net income as a percent of revenue would decrease. Plaintiff claims that Defendants had a duty to disclose this information.

Defendants filed this Fed.R.Civ.P. 12(b)(6) motion to dismiss the complaint in its entirety. Defendants argue that Count I of the complaint should be dismissed because Plaintiff fails to meet the heightened securities fraud pleading standards required under Fed.R.Civ.P. 9(b) and under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b)(2). Defendants further assert that dismissal of Count I removes this Court's supplemental jurisdiction over Counts II through VI. See 28 U.S.C. § 1367. Thus, we need only address Plaintiff's claims in Count I to determine if the complaint must be dismissed.

## DISCUSSION

When considering a motion to dismiss a complaint under Rule 12(b)(6), a court must primarily consider the allegations contained in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account. See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3rd Cir.1993). The court must accept as true all allegations in the complaint and must give the plaintiff the benefit of every favorable inference that can be drawn from those allegations. See J/H Real Estate, Inc. v. Abramson, 901 F.Supp. 952, 955 (E.D.Pa. 1995); Schrob v. Catterson, 948 F.2d 1402, 1405 (3rd Cir.1991). A complaint is properly dismissed only if it appears certain that the plaintiff cannot prove any set of facts in support of its claim which would entitle it to relief. See Ransom v. Marrazzo, 848 F.2d 398, 401 (3rd Cir.1988).

The relevant statutes for purposes of this motion are Section 10(b) and Rule 10b–5. Section 10(b) prohibits the "use or employ[ment], in connection with the purchase or sale of any security, ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe ..." 15 U.S.C. § 78j(b). Rule 10b–5 promulgated thereunder makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(b). Since Defendants Morin, Slavin, Farquhar, and Huber do not contest their liability as controlling persons under § 20(a), the court does not address that section of the Exchange Act.

A plaintiff suing under Rule 10b–5 must establish that a defendant made materially false or misleading statements or omissions with scienter upon which the plaintiff relied. See In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1417 (3rd Cir. 1997). Defendants do not challenge Plaintiff's claim of the basis of Plaintiff's reliance, though, and the court therefore does not address this aspect of Plaintiff's claim.[1] For facts or information to be material for purpose of securities fraud litigation requires that they "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made

---

1. Proceeding under a "fraud on the market" theory, plaintiff is provided a rebuttable presumption of reliance where plaintiff claims that defendant's omissions or misstatements interfered with an efficient market, resulting in inflated or delated stock prices and causing injury even absent direct reliance. See In re Burlington Coat Factory Secs. Litig., 114 F.3d at 1419 n. 8. Plaintiff's claim could proceed under such a theory in this case.

available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Additionally, "the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact ... [O]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *In re Westinghouse Secs. Litig.*, 90 F.3d 696, 714 (3rd Cir.1996) (quoting *TSC Indus.*, 426 U.S. at 450, 96 S.Ct. at 2132).

Defendants content (1) that Plaintiff fails to identify affirmative statements which were rendered misleading by Defendants' omissions; (2) that the "bespeaks caution" doctrine applies in this case and renders the omissions and misrepresentations alleged in the complaint inactionable; and (3) that Plaintiff fails to plead scienter adequately. Defendants' memo does not address Plaintiff's assertion that he may base his action of Defendants' affirmative duty to disclose material information. We find that Plaintiff may bring this action under such a theory and address this argument first. Although this holding is sufficient to defeat Defendants' motion as to arguments (1) and (2) above, we go on to address the merits of these arguments, finding them insufficient to dismiss the complaint as well. Finally, we address the issue of scienter and find that Plaintiff has adequately pled scienter as required by the PSLRA.

## I. *Duty to Disclose*

### A. *Generally*

■ Defendants contend that Plaintiff's claims fail because he does not identify Defendants' affirmative statements rendered misleading as a result of material omissions. Defendants maintain that Rule 10b–5 requires identification of a defendant's allegedly misleading statements and that the PSLRA requires the complaint to specify each allegedly misleading statement. We find this argument unpersuasive.

While Rule 10b–5 does specifically refer to omissions of material fact "necessary in order to make the statements made ... not misleading." 17 C.F.R. § 240.10b–5(b), courts have not interpreted Rule 10b–5 as literally as Defendants contend. A Supreme Court decision, a Third Circuit decision, and decisions of district courts within the Third Circuit support Plaintiff's reliance on a duty to disclose theory in a § 10(b) and Rule 10b–5 action. *See, e.g., Chiarella v. United States*, 445 U.S. 222, 230, 100 S.Ct. 1108, 1115–16, 63 L.Ed.2d 348 (1980) (approving § 10(b) actions based on duty to disclose theory); *Greenfield v. Heublein, Inc.*, 742 F.2d 751, 756 (3rd Cir.1984) ("Rule 10b–5 and § 10(b) of the Act make it unlawful to fail to disclose material information in connection with the purchase or sale of securities.") (citing *Chiarella*, 445 U.S. 222, 100 S.Ct. 1108); *Paul v. Berkman*, 620 F.Supp. 638, 641 (W.D.Pa.1985) (holding that Rule 10b–5 imposes duty on corporate insiders to disclose material information prior to trading); *Staffin v. Greenberg*, 509 F.Supp. 825, 832–33 (E.D.Pa.1981) (affirming that § 10(b) and Rule 10b–5 claims can be based upon failure to disclose material information where affirmative duty to disclose exists). Thus, Defendants cannot rely on Rule 10b–5's language in their claim that Plaintiff must identify affirmative statements rendered misleading by omissions.

Further, the PSLRA states that where *"the plaintiff alleges* that the defendant ... omitted to state a material fact necessary in order to make the statements made, in the light of the circumstance in which they were made, not misleading ... the complaint shall specify *each* statement alleged to have been misleading." 15 U.S.C. § 78u–4(b)(1) (emphasis added). This language essentially mirrors the Rule 10b–5 language which courts have interpreted as supporting actions under a duty to disclose theory. Defendants cite no case law or legislative history which suggests that the PSLRA prevents bringing suits under such a theory. Moreover, Plaintiff here claims not only that Defendants' omission rendered their affirmative statements misleading, but that Defendants breached a duty to disclose material information, regardless of whether or not such omis-

sions rendered any affirmative statements misleading.

## B. *Defendants' Duty to Disclose in the Instant Case*

Having determined that a plaintiff may base a Rule 10b–5 action upon a duty to disclose theory, we must determine whether Plaintiff in this case has alleged facts sufficient to establish his claim that Defendants in fact had such a duty. Plaintiff here makes three arguments in support of Defendants' duty to disclose based upon (1) a relationship of trust and confidence, (2) Defendants' trading on the non-public information, and (3) Defendants' choosing to speak on the non-public information. We find these arguments persuasive.

### 1. *The Relationship of Trust and Confidence*

■ The Supreme Court has defined the duty to disclose in securities cases as arising "from a relationship of trust and confidence between parties to a transaction." *Chiarella*, 445 U.S. at 230, 100 S.Ct. at 1115. Plaintiff adequately alleges that the parties in this case did have such a relationship. For example, in the Reorganization Agreement, Wonderware explicitly promised Plaintiff and other SSE shareholders that it would inform them of any changes that would have a material adverse effect on Wonderware. This promise was significant as SSE shareholders were relying on an accurate market valuation of Wonderware's stock for purpose of the SSE purchase. Thus, Wonderware created a relationship of trust with SSE shareholders, including Plaintiff, which required them to disclose the information regarding changes in operations which would result in lower income as percent of revenue and regarding significant changes in key personnel. The fact that these material changes adversely affected the price of Wonderware stock is evidenced by the drastic drop in Wonderware stock value after Slavin's December 8th announcement.

### 2. *Trading on Non–Public Information*

■ The Court also acknowledged in *Chiarella* that a corporate insider assumes an affirmative duty to disclose when she chooses to trade in shares of her corporation. *See id.* at 227, 100 S.Ct. at 1114; *see also Deutschman v. Beneficial Corp.*, 841 F.2d 502, 506 (3rd Cir.1988) ("The 'disclose or abstain from trading' rule ... imposes on insiders a duty to disclose information before they act on that information ..."). Plaintiff here, in addition to identifying Wonderware's trading on its allegedly overvalued shares by using them to purchase SSE, alleges insider trading on the part of Morin, Farquhar, and Huber which establishes a duty to disclose material information.

### 3. *Defendants' Choosing to Speak on Non–Public Information*

Finally, Plaintiff claims that Defendants had a duty to disclose information regarding Slavin's hiring and Morin's resignation once they chose to discuss that issue in a press release. *Jaroslawicz v. Engelhard Corp.*, 704 F.Supp. 1296 (D.N.J.1989), is instructive on this point. The *Jaroslawicz* court held that making an affirmative statement creates a duty to disclose information necessary to prevent the statement from being misleading. The court denied summary judgment where the defendant had concealed a prior decision to write-down metal refining facilities to avoid a devaluation of its stock. *Id.* at 1299; *see also Greenfield*, 742 F.2d at 756 (holding that voluntary statements create duty to disclose if statement is "reasonably calculated to influence the investing public") (quoting *SEC v. Texas Gulf Sulphur*, 401 F.2d 833, 862 (2nd Cir.1968)). In the instant case, Defendants chose to issue a press release announcing both Slavin's hiring and Morin's continuing as CEO.

Since Plaintiff adequately states a claim based on Defendants' duty to disclose, Defendants' argument that Plaintiff failed to identify any affirmative, misleading statements is not a basis for dismissal of the suit.

## II. *Defendants' Affirmative Statements Rendered Misleading by Defendants' Omissions*

Having established that Plaintiff may bring this suit under a duty to disclose theory, we need not determine whether Plaintiff

has identified actionable affirmative statements rendered misleading by Defendants' omissions. Even assuming *arguendo* that Plaintiff could not bring his claim under a duty to disclose theory, we find Defendants' arguments regarding the affirmative statements which Plaintiff has identified unpersuasive.

Plaintiff alleges (1) that statements in Wonderware's press release regarding Slavin's hiring and (2) that Wonderware's cautionary warning regarding changes in operations and changes in personnel were rendered misleading by Defendants' omissions. Defendants rejoin (1) that the statements in the press release are immaterial "puffery" which are inactionable as a matter of law, (2) that the cautionary warnings themselves cannot, as a matter or law, form the basis of a Rule 10b–5 claim as misleading affirmative statements, and (3) that Wonderware's cautionary warnings rendered any misrepresentations or omissions immaterial and inactionable as a matter of law under the "bespeaks caution" doctrine.

### A. Defendants' Press Release

■ Defendants claim that Wonderware's statements in the June 1995 press release that Slavin was "looking forward to working with Dennis [Morin] and the entire Wonderware team" and that "Dennis R. Morin continues as Chairman of the Board and Chief Executive Officer" are inactionable "puffery" which do not satisfy Rule 10b–5's materiality requirement. In the Third Circuit, puffing is defined according to materiality. If a statement is material, then it cannot be puffing. *See Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 200 (3rd Cir.1990) ("[t]o say that a statement is mere 'puffing' is, in essence, to say that it is immaterial"). The court in *Hoxworth* proffered statements such as "You cannot lose," and "This bond is marvelous" as examples of immaterial puffery. *Id.* Likewise, the court in *Newman v. Rothschild,* 651 F.Supp. 160, 163 (S.D.N.Y.

1986), described puffing as exaggerated salesperson statements which "the reasonable investor is presumed to understand" are not material. The *Newman* court's examples of puffery include statements such as "I'm the best in the business," or that a bond or stock is "red hot" such that an investor "could not lose." *Id.*

■ In the present case, however, Wonderware's press release did not contain exaggerated sales pitches. The statement that Morin would continue as CEO is a statement of fact, and Wonderware knew that Morin would not remain CEO for long and that Slavin was hired as his replacement. A reasonable investor might rely on such information. Dismissing these statements as immaterial as a matter of law, then, is inappropriate. *See Westinghouse,* 90 F.3d at 714.

### B. Wonderware's Cautionary Warnings

■ Plaintiff also identifies Defendants' cautionary warnings as affirmative statements rendered misleading as a result of omissions. As to the issue of Morin's resignation, in addition to identifying Wonderware's press release, Plaintiff identifies Wonderware's warning that "loss of key employees could have a material adverse effect" as a misleading half-truth because Defendants knew that Morin would leave and had already hired Slavin to replace him. Similarly, Plaintiff alleges that Wonderware's caution that it could give "no assurance that ... operating margins can be sustained in the future" was misleading where Defendants had already planned to implement changes that would result in lower income as a percentage of revenue. Defendants respond that the cautionary warnings themselves cannot form the basis of Plaintiff's claim as a matter of law. Defendants cite *Zeid v. Kimberley,* 930 F.Supp. 431, 437 (N.D.Cal.1996), for the proposition that "warnings and disclaimers cannot form the basis for a claim pursuant to § 10(b) or Rule 10b–5." [2] Defendants cites no Third Circuit

---

2. In *Zeid,* the court found inactionable defendant's warnings regarding the potential adverse effects of outside factors. *See Zeid,* 930 F.Supp. at 437. The plaintiffs in *Zeid* argued that defendant's warnings were misleading because the outside adverse factors mentioned were at the time affecting defendant's business. *See id.* This situation is distinguishable from ours. Plaintiff here claims that Wonderware had *already inter-*

decisions which hold that cautionary warnings themselves are inactionable· as a·matter of law, while *Zeid* conflicts with the Third Circuit's statements in *Westinghouse*.

*Westinghouse* suggests that cautionary statements and warnings may be actionable.· After noting that the materiality of a statement depends upon the context in which it is made, the court cited the Fifth Circuit's statement that "[t]o warn that the untoward may occur when the· event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Westinghouse*, 90 F.3d at 710 (citing *Rubinstein v. Collins*, 20 F.3d 160, 171 (5th Cir.1994)). In this case, Defendants not only knew of adverse changes, but planned them at least a month before entering into the Reorganization Agreement. Defendants then issued their allegedly misleading cautionary warnings after having promised to inform Plaintiff of any adverse, material changes. Within this context, Defendants cautionary warnings lose the protection Defendants seek under *Zeid*. Plaintiff is not barred from identifying Defendants' cautionary warnings as affirmative, misleading statements given the context in which they were made.

## C. · The "Bespeaks Caution" Doctrine

█ Defendants argue that the "bespeaks caution" doctrine renders any alleged mis-·statements or omissions immaterial as a matter of law. Plaintiff maintains that the "bespeaks caution" doctrine is not applicable to this case because (1) it only covers omissions regarding future projections and forecasts, as opposed to presently known information, and (2) Defendants' warnings were insufficient to make their omissions immaterial.

In. *Westinghouse*, the Third Circuit described the "bespeaks caution" doctrine by stating "[W]hen an offering document's *forecasts, opinions* or *projections* are accompanied by meaningful cautionary statements, the *forward-looking* statements will not form the basis for a securities fraud claim ... In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a . matter of

law." *Id.* at 707 (quoting *In re Donald J. Trump Casino Secs. Litig.*, 7 F.3d 357, 371–72 (3rd Cir.1993)) (emphasis added). The court further noted that "cautionary statements must be substantive and tailored to the specific *future* projections, estimates or opinions in the prospectus which the plaintiffs challenge." *Id.* (quoting *Trump Casino*, 7 F.3d at 371–72) (emphasis added).

Defendants rely on *Trump Casino* for the proposition that the "bespeaks caution" does apply to statements or omissions regarding information of present facts. They note that the plaintiffs in *Trump Casino* alleged that the defendants omitted to state a number of present facts and that the court applied the "bespeaks caution" doctrine in dismissing plaintiffs' claims. However, Defendants misinterpret that case. The *Trump Casino* court only applied the "bespeaks caution" doctrine to statements or omissions of forecasts, opinions, and projections. Specifically, the court applied to doctrine when it found that the defendants' misrepresentation concerning their *opinion* about the casino's ability to repay its debt was inactionable. *See id.* at 371–73. The court also applied the doctrine to two of defendants' omissions which it found were accompanied by sufficient cautionary language: (1) defendants' omission of their *forecast* that the casino would require a daily win of $1.3 million to repay its debts and (2). defendants' omission of their *belief* that ·it would be difficult for the casino to attract customers away from other casinos in Atlantic City. *See id.* at 371–77. Thus, Defendants' reliance on *Trump Casino* to suggest that the "bespeaks caution" doctrine applies to presently known facts is misplaced.

Moreover, Defendants' reliance on *Trump Casino* for the proposition that the "bespeaks caution" doctrine applies to presently known facts is in conflict ·with· decisions of courts in the Third Circuit. The court in *J/H Real Estate*, 901 F.Supp. at 956, cites *Trump Casino* in support of its statement that "misleading statements must be 'forward-looking' before the 'bespeaks caution' doctrine can be invoked." *See also Westinghouse*, 90. F.3d at 707 (citing *Trump Casino*

*nally* planned the very changes which it warned    of as potentially affecting its business.

in support of proposition that "bespeaks caution" doctrine applies to "forward-looking" statements) Likewise, in the First Circuit the "bespeaks caution" doctrine is applied to forward-looking statements. *See, e.g., Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1213 (1st Cir.1996) (stating that the "bespeaks caution" doctrine applies to forward-looking statements, not statements of present facts).

The PSLRA's "safe harbor" provision also specifically protects only forward-looking statements made with accompanying cautionary language. *See* 15 U.S.C. §§ 78u–5, 77z–2. The Conference Committee report for the PSLRA, discussing the Act's "safe harbor" for forward-looking statements and its similarity to the judicially created "bespeaks caution" doctrine specifically cited *Trump Casino. See* 141 Cong. Rec. H13, 703 n. 29 (1995). Here, Plaintiff does not allege that Defendants made forward-looking misstatements or omissions, Plaintiff alleges that Defendants made omissions of present fact.

■ Further, even if Defendants were correct in arguing that the "bespeaks caution" doctrine can apply regardless of whether or not omitted statements are forward-looking, the Court would still have to determine whether or not Defendants' cautionary language renders any omissions immaterial as matter of law. For example, the court in *Westinghouse* found the defendants' cautionary warnings inadequate to render immaterial defendants' misrepresentations regarding the adequacy of loan reserves where the defendants knew of the inadequacy of their loan reserves. *Westinghouse*, 90 F.3d at 709. "[D]efendants' cautionary statements about the future did not render . . . misrepresentations immaterial . . . [A] reasonable investor would be very interested in knowing, not merely that future economic developments might cause further losses, but that . . . current reserves were known to be insufficient . . ." *Id.* The court further noted that "notwithstanding the cautionary language stressed by defendants . . . there is a substantial likelihood that defendants' misrepresentations . . . would have assumed actual significance to a reasonable investor . . ." *Id.* at 710. In our case, Defendants' omissions regarding its planned change in operations and its plan to replace Morin with Slavin also could have "assumed actual significance to a reasonable investor" notwithstanding the cautionary language Defendants stress. Thus, application of the "bespeaks caution" doctrine to these omissions is inappropriate.

Plaintiff cites a number of cases for the proposition that warnings of possible adverse events are insufficient to make omissions of present knowledge of certain future events legally immaterial. *See Id.* at 709 ("defendants' cautionary statements about the future did not render those misrepresentations [of known losses and know risks] immaterial"); *In re Prudential Secs. Inc. Ltd. Partnerships Litig.*, 930 F.Supp. 68, 72 (S.D.N.Y. 1996) (finding that defendants' caution that certain assets "could decline" was insufficiently cautionary when plaintiffs alleged defendants knew those assets "would decline"); *J/H Real Estate, Inc. v. Abramson*, 901 F.Supp. 952, 956 (E.D.Pa.1995) (refusing to apply "bespeaks caution" doctrine where plaintiff alleged that defendants concealed current events and business conditions); *see also Rubinstein*, 20 F.3d at 171 ("to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit").

Defendants argue that the information they failed to disclose was "soft" information which their cautionary warnings rendered immaterial under the "bespeaks caution" doctrine as opposed to "hard" information not rendered immaterial by cautionary warnings. We disagree, however, that the information Defendants failed to disclose is "soft" information. The Third Circuit has defined "soft" information in this context as "statement of *subjective* analysis or extrapolation, such as opinions, motives, and intentions, or forward-looking statements such as projections, estimates, and forecasts." *Craftmatic Secs. Litig. v. Kraftsow*, 890 F.2d 628, 642 (3rd Cir. 1989) (emphasis added). In this case, the information that Defendants failed to disclose is not subjective or forward-looking. Although the omissions concerned future events, Defendants allegedly knew at the time of their omissions that they would change operations and that they would replace Morin with Slavin. Such information

cannot be characterized as subjective or as a forward-looking projection, estimate, or forecast. Indeed, Wonderware's stock plummeted following Slavin's December 8th announcement, contradicting the contention that the undisclosed information was soft.

Defendants also cite *In re Numerex Corp. Secs. Litig.*, 913 F.Supp. 391 (E.D.Pa.1996), in support of their claim that their cautionary warnings rendered any omissions immaterial. The warning in that case regarding key personnel was almost identical to Wonderware's, and the court found it adequate to render immaterial defendant's failure to disclose a CEO's plans to resign. *See id.* at 401–02. We find *Numerex* distinguishable, however. As Plaintiff points out, the *Numerex* court found the resignation of the CEO immaterial based upon his short tenure as CEO and the fact that he did not bring "any peculiarly valuable technical or business expertise to the company." *Id.* at 401. The court even noted that, unlike in our case, stock in the CEO's company remained "remarkably stable" following his resignation. *Id.* at 401–02. The court does go on to state, in dicta, that the cautionary warning would have made this omission immaterial even had the CEO's resignation been material. *See id.* However, the plaintiff in *Numerex* did not identify any affirmative, misleading statement regarding the CEO such as the one Defendants made in this case that Morin would continue as CEO. *See id.* at 401. Also, the complaint in that case alleged that defendants "must have known" because of the CEO's age that he would be resigning. *Id.* No such allegation was made here. Instead, Plaintiff alleges (and supports this allegation with statements made by Defendants) that Defendants did hire Slavin to replace the resigning Morin.

### III. *Scienter*

The PSLRA, applicable to actions commenced after December 22, 1995, requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C.A. § 78u–4(b)(2) (West Supp.1997). Complaints which fail to meet this requirement must be dismissed. *See* U.S.C. § 78u–4(b)(3)(West Supp.1997). Courts disagree, however, as to the precise pleading burden the Act places upon plaintiffs.

Prior to the enactment of the PSLRA, the Third Circuit required a plaintiff to allege facts demonstrating that a defendant "lacked a 'genuine belief that the information disclosed was accurate and complete in all material respects.'" *In re Phillips Petroleum Secs. Litig.*, 881 F.2d 1236, 1244 (3rd Cir. 1989) (quoting *McLean v. Alexander*, 599 F.2d 1190, 1198 (3rd Cir.1979)). Circumstantial evidence and even recklessness could meet the scienter requirement for § 10(b) and Rule 10b–5 actions. *Id.* The Second Circuit, on the other hand, required a plaintiff to plead a "strong inference" of scienter by alleging either (1) facts establishing a motive and opportunity to commit fraud; or (2) facts constituting circumstantial evidence of either reckless or conscious behavior. *See In re Time Warner, Inc. Secs. Litig.*, 9 F.3d 259, 268–69 (2d Cir.1993). While the PSLRA's language requiring "a strong inference of scienter" suggests that it has simply codified the Second Circuit's scienter requirement, courts are split as to whether or not this is the case.

The court in *Marksman Partners v. Chantal Pharm.*, 927 F.Supp. 1297 (C.D.Cal. 1996), held that the less stringent of the Second Circuit's two prong standard, the "motive and opportunity" standard, met the PSLRA's scienter requirement. However, the court in *Friedberg v. Discreet Logic, Inc.*, 959 F.Supp. 42, 48–49 (D.Mass.1997), held that the PSLRA scienter requirement is intended to be stronger than the Second Circuit's "motive and opportunity" or "recklessness" pleading requirements but not stronger than the Second Circuit's more rigid "conscious behavior" standard. The court then adopted the "conscious behavior" standard, requiring plaintiff to "set forth specific facts that constitute strong circumstantial evidence of conscious behavior by defendants." *Id.* at 50. Likewise, the court in *Norwood Venture Corp. v. Converse, Inc.*, 959 F.Supp. 205, 209 (S.D.N.Y.1997), held that a plaintiff needs to allege "specific facts which create a strong inference of knowing misrepresentation . . ." in order to meet the PSLRA's scienter requirement. In *Nor-*

*wood,* plaintiff alleged that defendant intentionally omitted to disclose that it was going to issue a bond and that its purchase of a target company depended upon the successful issuance of such bond. *See id.* at 209. The court held that plaintiff adequately met the scienter requirement under its "knowing misrepresentation" standard. *See id.*

We agree with the *Norwood* and *Friedberg* courts' interpretations of the PSLRA. The Act's legislative history suggests that it was intended at least to surpass the Second Circuit's "motive and opportunity" and "recklessness" standards. The Conference Committee report states that because the committee did not intend to codify the Second Circuit's scienter pleading standards, it left out "certain language relating to motive, opportunity, and recklessness." 141 Cong. Rec. H13, 702 n. 23 (1995).

The *Friedberg* court thus properly adopted the "conscious behavior" standard from the Second Circuit to meet the PSLRA's scienter requirement since the Conference Committee Report retained the "conscious behavior" pleading approach but eliminated the "motive and opportunity" and "recklessness" standards. *See Friedberg,* 959 F.Supp. at 49–50. Moreover, under Second Circuit case law, the "conscious behavior" standard is more difficult to pass than the "motive and opportunity" or "recklessness" standards. *See id.* This approach is consistent with the *Norwood* court's "knowing misrepresentation" standard since each requires the plaintiff to allege facts which give rise to a strong inference or constitute strong circumstantial evidence of either knowing or conscious behavior.

Applying this "conscious behavior" standard to the instant case, we find that Plaintiff has adequately pled scienter as required by the PSLRA. In addition to alleging that Wonderware benefited from purchasing SSE with inflated shares of Wonderware stock while intentionally withholding material information, Plaintiff here also alleges that three executives at Wonderware sold 129,570 shares of Wonderware stock for over $4.6 million while in possession of material, non-public information. Accepting Plaintiff's figures, as we must for

present purposes, the three individual defendants sold 71.9%, 14.9% and 10.6% of their holdings respectively. The *Friedberg* court found a plaintiff's allegation that five insiders collectively sold only 12% of their holdings, but two of the individuals sold 33% and 50% of their holdings adequate to plead scienter under the "conscious behavior" standard. *See Friedberg,* 959 F.Supp. at 51. The court also distinguished the case from *In re Apple Computer Secs. Litig.,* 886 F.2d 1109 (9th Cir.1989) and *In re Worlds of Wonder Secs. Litig.,* 35 F.3d 1407 (9th Cir.1994), two cases which Defendants cite to support their position that insider trading of only a portion of holdings does not create a strong inference of scienter. As the *Friedberg* court noted, *Apple Computer* and *Worlds of Wonder* were both decided on motions for summary judgment after defendants had been able to explain any questionable trading; they were not decided on motions to dismiss. *See id.*

Defendants also cite *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995) (finding insider's sales of 11% of holdings insufficient to plead scienter), in maintaining that alleging insider trading in small amounts does not establish scienter. However, in *Acito* only one defendant engaged in trading compared with three defendants in our case, and he only sold 11% of his holdings on inside information compared with sales of 71.2%, 14.9% and 10.6% of holdings in our case. *Id.*

Finally, Defendants claim that allegations of insider trading alone are not enough to create a strong inference of scienter. However, Plaintiff does not rest his scienter pleading solely upon allegations of insider trading. Plaintiff alleges not only that corporate insiders at Wonderware traded in significant quantities on material, non-public information, but that Wonderware purchased SSE with approximately $7 million of inflated Wonderware stock while intentionally withholding adverse, material information. Thus, Plaintiff has alleged facts constituting strong circumstantial evidence of Defendants' "conscious behavior," meeting the PSLRA's standard for pleading scienter.

## CONCLUSION

The court denies Defendants' motion to dismiss since Plaintiff has adequately pled securities fraud as required under Third Circuit law and under the Private Securities Litigation Reform Act of 1995. Plaintiff's allegations adequately constitute a § 10(b) and Rule 10b–5 claim under a duty to disclose theory. Additionally, Plaintiff does identify specific, actionable statements which were rendered misleading by Defendants' omissions. The "bespeaks caution" doctrine does not render Defendants' omissions immaterial as a matter of law, and Plaintiff has adequately pled scienter as required under the PSLRA.